# Exhibit 1

**DECLARATION OF VADIM NATHAN SHULMAN IN SUPPORT OF**
***EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

I, VADIM NATHAN SHULMAN, of 11 President JF Kennedy Avenue, 98000 Monaco, declare as follows:

1.      I am an engineer and a businessman.  I am the ultimate beneficial owner of 33,332 ordinary shares in Halliwel Assets Inc ("**Halliwel**").  Hornbeam Corporation ("**Hornbeam**") is the registered shareholder of these shares which it holds as nominee for Bracha Foundation ("**Bracha**").  I am the settlor and beneficiary of Bracha. Accordingly, I am the ultimate beneficial owner of one third of the shares of Halliwel.

2.      I make this Declaration in support of Hornbeam Corporation's ("**Hornbeam**") application(s) to one or more U.S. District Court(s) pursuant to 28 U.S.C. § 1782 (the "**1782 Application**").

3.      I am authorized to make this Declaration on behalf of Hornbeam.  Except as otherwise indicated, the facts and matters set out in this Declaration are derived from my own personal knowledge and from my review of relevant documents, which have been described and/or translated for me, and are true. Where facts and matters are not within my own knowledge, the source of my information is stated and the facts and matters are true to the best of my information and belief.

4.      I am a native Russian speaker and also speak Ukrainian.  I do not have the ability to effectively read, write, or understand English.  I have had this Declaration translated for me.

**BACKGROUND AND FORMATION OF THE OHIO STEEL PLANT JOINT VENTURE**

5.      While there are multiple entities and individuals involved, this dispute is really between three individuals: Mr. Igor Kolomoisky ("**Kolomoisky**"), Mr. Grenady Bogolubov ("**Bogolubov**"), and me.

6.      Since around 1999, I have entered into various transactions and held business interests with two other Ukrainian businessmen, Kolomoisky, and Bogolubov.  In my experience, Bogolubov always follows the direction of Kolomoisky in business decisions.  At the time, Kolomoisky, Bogolubov, and I were friends.

7.      In 2001, I discovered an investment opportunity in a steel factory called CSC, Ltd. ("**CSC**") in Warren, Ohio.

8.      I shared this opportunity with Kolomoisky and Bogolubov and both were interested in participating.  After discussions, we entered into a joint venture ("**Joint Venture**") to purchase a steel manufacturing facility, the equipment, and the real property (the "**Steel Factory**").

9.      From the inception of the Joint Venture, Kolomoisky, Bogolubov, and I agreed to have an equal participation and beneficial interest in the steel plant and the company that would become Warren Steel ("**Joint Venture Agreement**").  The Joint Venture Agreement was not fully formalized in writing, but was nevertheless binding on the three of us.

10.     Agreements that are not fully formalized in writing but nevertheless binding are typical and commonplace in the Ukrainian business environment, and were typical and commonplace between Kolomoisky, Bogolubov, and me. Kolomoisky, Bogolubov, and I had previously and have subsequently entered into similar ventures pursuant to such agreements, some of which were very profitable.

11.     Within the Joint Venture Agreement, Kolomoisky, Bogolubov, and I agreed that loans and investments would be equally contributed and in the event of an approved loan or investment made by one of us, the understanding was that the other two would contribute equally.  This did not mean that we would each equally invest in each individual investment or loan.  Rather, it was the overall agreement that Kolomoisky, Bogolubov, and I would act for the benefit of the Joint

Venture and contribute and share in the aggregate of all investments, all profits, and all losses to which we agreed.  It was agreed that all agreed investments and loans would be reconciled.

## MY PURCHASE OF THE STEEL PLANT AND THE FORMATION OF WARREN STEEL

12.     In 2001, I became aware of an investment opportunity concerning a steel company called CSC.  CSC operated a steel factory in Ohio before it had filed for bankruptcy earlier that year.  I was originally interested in acquiring CSC's steel factory, breaking the plant down, and transporting it to Ukraine where it would be reconstructed and thereafter carry on the steel-making business.

13.     I made the initial investment of $13.5 million for the Steel Factory through my entity, Instrad Limited.[1]  Between 2001 and the end of 2005, I estimate that I invested an additional $15 million for Steel Factory-related expenses.  It was agreed that Kolomoisky and Bogolubov would compensate me for my initial investments of roughly $28.5 million.

14.     In 2001, Kolomoisky, Bogolubov, and I formed Warren Steel, a company incorporated under the laws of Delaware, as a potential holding company for the Steel Factory.

15.     After being transferred from Instrad Limited to Plama Limited and then back to Kolomoisky, Bogolubov, and me, the Steel Factory was finally assigned on November 26, 2007 to Warren Steel.

## THE FORMATION OF HALLIWEL AND THE INVESTMENT AGREEMENT

16.     Around 2006, pursuant to the Joint Venture Agreement, Kolomoisky, Bogolubov and I re-confirmed the Joint Venture, but jointly decided to continue operations of the Steel Factory in Warren, Ohio instead of dismantling and relocating the Steel Factory to Ukraine.  It was agreed

---

[1] I appointed Aktiva Sapir ("**Sapir**") to act as my agent for this deal. Sapir purchased the equipment with my money on behalf of my company Instrad Limited.

at this time that the new objective would require additional investment.  As such, we jointly agreed upon an investment of $30 million each ("**Investment Agreement**").

17.     In 2006, a $90 million credit line was opened for the benefit of Warren Steel by Divot Enterprises Limited ("**Divot**"), an entity controlled by Kolomoisky. The $90 million consisted of $30 million that Kolomoisky allocated as part of my share of the expected future profits from a separate joint venture with Roman Abramovich ("**Abramovich**") and $60 million brought by Kolomoisky and Bogolubov.  In subsequent years, my share of the expected future profits from the Abramovich deal materialized in excess of the $30 million that Kolomoisky allocated to the Investment Agreement on my behalf.

18.     The Investment Agreement was formed during a series of discussions as has been the common practice between Kolomoisky, Bogolubov, and me.  It was memorialized in further documentation.

19.     Halliwel, the current Sole Member of Warren Steel, was incorporated on January 5, 2006 as a BVI business company pursuant to the BVI Business Companies Act, 2004.

20.     As of June 30, 2006, Halliwel's sole director, Panikos Symeou ("**Symeou**"), held all shares of Halliwel in trust for Kolomoisky, Bogolubov, and me 1/3 each.

21.     On April 3, 2008, the shareholders of Warren Steel, Kolomoisky Bogolubov, and I, agreed that we would appoint Halliwel as the sole member of Warren Steel and we would resign as members. As such, Halliwel become the sole member of Warren Steel.

22.     Additionally, the drawn down amount of the $90 million credit line was converted into equity of Halliwel in equal parts for the ultimate benefit of Kolomoisky, Bogolubov, and me.

23.     From April 2008, 100% of Warren Steel has been held by Halliwel.

24.     Through our one-third shares in Halliwel, Kolomoisky, Bogolubov, and I each continued to have one-third control over Warren Steel.

25.     After the incorporation of Halliwel until recently, I did not take an active role in the management of Warren Steel.  Instead in the last few years my advisor, Mr. Ronny Pifko ("**Pifko**") has managed my interest in Warren Steel.  I understood that Pifko liaised, on my behalf, with Kolomoisky's advisor, Mr. Timur Novikov ("**Novikov**").

26.     My friendship with Kolomoisky became severely strained as a result of a business deal that we undertook involving Abramovich.  Kolomoisky and Abramovich had a disagreement in relation to assets that Abramovich accused Kolomoisky of improperly retaining as part of a transaction.  The relationship soured when I made known to Kolomoisky that I believed Kolomoisky was in the wrong

27.     Again, the terms of the Joint Venture Agreement obligated Kolomoisky, Bogolubov, and I to act for the benefit of the Joint Venture and contribute and share in the aggregate of all investments, all profits, and all losses to which we agreed.

28.     This practice continued until recently.  To my dismay, despite the agreement to act jointly and share equally, individuals working on my behalf have uncovered disturbing documentation that appears to show that Kolomoisky and Bogolubov (the "**Other Ultimate Beneficial Owners**"), through entities acting in the United States as their agents or otherwise under their control, have been self-dealing and operating Warren Steel for the Other Ultimate Beneficial Owners' benefit and to the detriment of me, Hornbeam, Halliwel, and Warren Steel.

29.     In 2012, I asked my attorney, Fabrizio N. Campanile, an attorney-at-law based in Zurich, Switzerland, to look into my Warren Steel investment.

## THE UNILATERAL AND CLANDESTINE APPROVAL
## OF THE DEBT RESTRUCTURING AGREEMENT

30.     In 2014, Hornbeam discovered that Halliwel's Other Ultimate Beneficial Shareholders and/or Symeou, acted in concert with Warren Steel's president, Mordechai Korf ("**Korf**"), without my or Hornbeam's prior knowledge or consent, to approve multiple "related party loans" resulting in a debt-restructuring agreement that gave lenders related to and/or controlled by the Other Ultimate Beneficial Owner(s) a priority security interest in Warren Steel.

31.     By approving these loans as well as other related-party transactions, Kolomoisky and Bogolubov have ignored the Joint Venture Agreement and have proceeded to make decisions in relation to Warren Steel, without consulting me in any way, that have been to the detriment of Halliwel, Hornbeam and me and have caused or contributed to Halliwel's sole director, Symeou, to breach the duties he owes to Halliwel and its shareholders by non-management and/or mis-management of Halliwel's sole asset, Warren Steel.  In the alternative, Halliwel's director, Symeou, and Warren Steel's president, Korf, may be the beneficiaries of self-dealing, either for their individual benefit or for the benefit or the Other Ultimate Beneficial Owner(s).

32.      I believe that I am being treated oppressively, prejudicially and possibly discriminatory due in part to the scheme created to secure Warren Steel's assets and revenues with related-party debt and participation in related-party transactions.

33.     In addition to the self-dealing and related-party debt, neither Kolomoisky or Bogolubov compensated me for my initial investment of $28.5 million into the Steel Factory  As such, they failed to honor their commitment to share equally in the investment pursuant to the Joint Venture Agreement.

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of

perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:          Monaco,
                December 17, 2014

_____
                        Vadim Nathan Shulman

# Exhibit 2

**DECLARATION OF MICHAEL JOHN FAY IN SUPPORT OF**
***EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

I, Michael John Fay QC, of Frenchman's Cay, British Virgin Islands, declare as follows:

**QUALIFICATIONS TO PROVIDE EXPERT EVIDENCE**

1.  I am a partner at Advocates BVI in the British Virgin Islands.

    a.  I was educated at Nottingham Law School, England where I obtained an LLB in 1988.

    b.  I then attended the Inns of Court School of Law in London where I obtained the degree of Utter Barrister in June 1989.

    c.  I was called to the Bar in England & Wales in July 1989.

    d.  I practiced as a barrister from chambers at 5 Fountain Court, Birmingham and 11 New Square, Lincoln's Inn from 1989 to 1996.

    e.  In 1996, I relocated to the British Virgin Islands and was admitted as a Barrister of the Eastern Caribbean Court - British Virgin Islands.

    f.  I spent approximately 24 months in the Turks & Caicos Islands during 1999 to 2001 - I was admitted as an Attorney in the Turks & Caicos Islands in 1999.

    g.  I continued to practice British Virgin Islands law part time whilst in the Turks & Caicos Islands and made a number of trips back to the British Virgin Islands during that period.

    h.  I returned to full time practice in the British Virgin Islands in 2001. I was the Vice-President of the BVI Bar Association from 2006 to 2008.

    i.  I am also admitted as a Barrister of the Eastern Caribbean Court in Anguilla and in St. Kitts & Nevis - I occasionally appear in the Courts in Anguilla and in St. Kitts & Nevis as an advocate instructed by a firm practicing in the respective jurisdiction.

    j.  In July 2011, I was appointed to act as a Deputy High Court Judge of the Eastern Caribbean Supreme Court. An appointment as a deputy High Court Judge is not a full-time appointment, but allows the Chief Justice to appoint lawyers to sit as Judges on a temporary part-time basis.

    k.  On 18 March 2013, I was appointed as one of Her Majesty's Counsel Learned in the Law. This appointment is normally shortened to "Queen's Counsel" and the designation "QC" will now appear after my name.

    l.  My practice is predominantly corporate law, dispute resolution and trusts. I am a member of STEP.  I was the Vice-President of the British Virgin Islands Bar

Association and a member of the BVI Government Company Law Review Committee.

m. I am not connected in any way to the parties to this action, and have not acted for any of the parties in any litigation or otherwise.

## PURPOSE OF DECLARATION

2. I am providing this declaration (this "**Declaration**") in support of the application(s) by Hornbeam Corporation ("**Hornbeam**") to one or more U.S. District Court pursuant to 28 U.S.C. § 1782 (the "**Application**") seeking discovery which Hornbeam will use in the To-Be-Filed BVI Proceeding(s) (described and defined below).

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge or learned from my review of relevant documents, including, without limitation, the sworn declarations of Vadim N. Shulman and Fabrizio N. Campanile, the Swiss Counsel for Mr. Shulman and Hornbeam (the "**Campanile Declaration**"), or upon my opinion based upon my experience and knowledge. To the extent matters stated in this Declaration are statements of legal opinion, such statements represent my view of the law of the BVI as a practicing BVI attorney.

## THE LEGAL SYSTEM IN THE BRITISH VIRGIN ISLANDS

4. The legal system in the BVI is based on the English system of law. The BVI Legislative Assembly enacts primary legislation by way of statute, and some English statutes have been specifically extended to the BVI or incorporated into the law and practice in BVI by virtue of the West Indies Associated States Supreme Court (Virgin Islands) Act (Cap 80). The principles of English common law and equity were extended to the BVI by statute.

5. The BVI court system is part of the Eastern Caribbean Supreme Court, and comprises a Magistrates Court and a High Court. The Commercial Court is a division of the High Court. The Court of Appeal of the Eastern Caribbean Supreme Court is the primary Court of Appeal, and the Privy Council in England is the final Appellate Court. Decisions of the Privy Council are binding authority on BVI Courts. Decisions of the House of Lords and Court of Appeal in England are highly persuasive authority before BVI Courts.

6. The doctrine of judicial precedent applies in the BVI as in England. There is a comparatively small body of case law in the BVI, but where there is no applicable BVI case law, the BVI will look for assistance to other Caribbean, English and/or Commonwealth authorities. There are no authoritative text books written on BVI law, but Harney Westwood & Riegels' text on British Virgin Islands Commercial Law 2nd Ed. ("**Harney's text**") contains reasonably accurate summaries of many aspects of BVI commercial law.

7. As a general rule, BVI courts follow English and/or Commonwealth authorities to the extent that they are not inconsistent with either BVI statutory provisions or binding BVI authority, and provided that they do not interpret English statutory provisions which have no equivalent in the BVI.

## FACTUAL BACKGROUND OF CASE AND THE INITIAL BVI INJUNCTION AND LIQUIDATION PROCEEDINGS, NOW MOOTED AND DISMISSED

2

8. The following summary of previous proceedings in the British Virgin Islands is contained in the Campanile Declaration.

   a. The British Virgin Islands firm Walkers acted for Hornbeam in an application for an injunction to prohibit an extraordinary general meeting of the shareholders of Halliwel Assets Inc ("**Halliwel**"), of which entity Hornbeam owns 1/3rd of the shares. Hornbeam was told that the extraordinary general meeting would occur to approve a proposed restructuring of the debt of Warren Steel LLC ("**Warren Steel**") (the "**debt restructuring**").  Warren Steel is the sole asset of Halliwel, and Halliwel owns 100% of the equity interests of Warren Steel.

   b. Pursuant to the proposed debt restructuring, whereby Warren Steel's lenders - believed to be (beneficially) owned and/or controlled by Halliwel's other ultimate beneficial shareholders -- would obtain security in respect of Warren Steel LLC hard assets.

   c. Proceedings were commenced in the BVI Commercial Court (the "**BVI Court**") in Matter No. BVIHC(COM) 2014/105 (the "**Injunction Proceedings**") to enjoin the extraordinary general meeting such that there would be time for Hornbeam to evaluate an assess the proposed debt restructuring.

   d. On 29 August 2014, an application was issued for an urgent ex parte injunction by Hornbeam against Halliwel, its director and shareholder Panikos Symeou ("**Mr Symeou**") and Marigold Trust Company Limited ("**Marigold**").  The Injunction Proceedings were issued on the same day. The injunction sought was granted by the Honourable Justice Byer on 29 August 2014 (the "**Injunction**").  The Injunction was continued by agreement between the parties on 25 September 2014. However, during the course of the respondents' opposition to the injunction, Hornbeam learned that the proposed debt restructuring had already been passed and approved by Symeou and Warren Steel's management, without being placed for consideration at the extraordinary general meeting, which meeting never occurred.

   e. On 13 October 2014, at a hearing before the Honourable Justice Bannister QC, the Injunction Claim was dismissed as moot and the Injunction was stated to lapse as at 4pm on that date.

   f. Hornbeam then commenced proceedings in the BVI Court entitled *In the Matter of Halliwel Assets Inc.*, Matter No. BVIHC (COM) 2014/134 (the "**BVI Liquidation Proceedings**").

   g. The BVI Liquidation Proceedings were commenced by Originating Application filed on 10 October 2014 seeking the appointment of a liquidator of Halliwel (the "**Originating Application**"). The Originating Application is attached hereto as **Exhibit 1**.

   h. On the same day, an Ordinary Application was filed by which Hornbeam sought the appointment of a provisional liquidator over the assets of Halliwel. The Ordinary Application was dismissed at a hearing on 13 October 2014. The Originating Application was never listed or heard.

   i. By the Originating Application, Hornbeam sought the appointment of a liquidator pursuant to section 162(1)(b) of the Insolvency Act, 2003 (the "**Insolvency Act**").

3

j.  The Originating Application briefly summarised the grounds of the application as follows:

> "*The controlling minds of the Respondent, Halliwel Assets Inc (**"Halliwel"**) (Mr Panikos Symeou (**"Mr Symeou"**) and/or Mr Igor Kolomoisky (**"Mr Kolomoisky"**) and/or Mr Genady Bogolubov (**"Bogolubov"**) have proved themselves to be dishonest, deceitful and willing to act in a fraudulent manner to further their own agenda. Halliwel's assets (being the shares in Warren Steel Holdings Inc) are at serious risk while Halliwel is under the control of Mr Symeou. The Applicant, Hornbeam Corporation, is justified in having no confidence in Mr Symeou to conduct the management of the affairs of Halliwel and in the circumstances, the appointment of a provisional liquidator followed by the appointment of a liquidator is the only means of protecting its interest in Halliwel.*"

k.  The BVI Liquidation Proceedings have been withdrawn by consent between the parties. Hornbeam is at liberty to issue a further Originating Application and I have been advised it intends to do so. I have been advised that the lack of adequate disclosure regarding the underlying claims was a major contributing factor to Hornbeam's decision to consent to withdraw the BVI Liquidation Proceedings, which Hornbeam was forced to bring on an emergency basis.

9.  Section 162 of the Insolvency Act states that:

> "*(1) the Court may, on application by a person specified in section (2), appoint a liquidator of a company under section 159(1) if (b) the Court is of the opinion that it is just and equitable that a liquidator should be appointed*".

10. A copy of sections 159 to 168 of the Insolvency Act are attached hereto as **Exhibit 2**.

11. A summary of the principles upon which the BVI Court will approach an application to appoint liquidators on the just and equitable ground is found Harney's text at 7.048. A copy of Harney's text 7.048 is attached hereto as **Exhibit 3**. It states, in relation to the just and equitable ground:

> "*This phrase has been given wide and flexible judicial interpretation in other common law jurisdictions. Whilst it is not confined to particular instances, it has been held to include such situations as the failure of a company's objects, disappearance of the justification for the company's continued existence, fraud or mala fides in the formation or running of the company, refusal by the majority shareholder to pay dividends or produce accounts, deadlock in the management of the company, breakdown in trust and confidence between the members in a 'quasi-partnership' company, and where the legitimate expectations of members in a small quasi-partnership company have been defeated even if there are no legal wrongs.*"

## THE TO-BE-FILED BVI PROCEEDINGS

12. Fabrizio N. Campanile, Hornbeam's Swiss Counsel, has advised me that Hornbeam will soon commence litigation in the BVI as a minority shareholder arising out of the conduct of Halliwel, Mr Symeou, Marigold, Mr Kolomoisky, and Mr Bogolubov. The new proceedings (the "**184I Proceedings**" or "**To-Be-Filed BVI Proceeding(s)**") will be commenced pursuant to Part XA of the Business Companies Act 2004 (the "**BC Act**").

## PART XA BC ACT – MEMBERS REMEDIES

13. Part XA is captioned "*Members Remedies"* and provides as follows:

*184A.*
*In this Part, "member", in relation to a company, means*
    *(a) a shareholder or a personal representative of a shareholder;*
    *(b) a guarantee member of a company limited by guarantee; or*
    *(c) an unlimited member of an unlimited company.*

*184B.*
*(1)*    *If a company or a director of a company engages in, proposes to engage in or has engaged in conduct that contravenes this Act or the memorandum or articles of the company, the Court may, on the application of a member or a director of the company, make an order directing the company or director to comply with, or restraining the company or director from engaging in conduct that contravenes, this Act or the memorandum or articles.*
*(2)*    *If the Court makes an order under subsection (1), it may also grant such consequential relief as it thinks fit.*
*(3)*    *The Court may, at any time before the final determination of an application under subsection (1), make, as an interim order, any order that it could make as a final order under that subsection.*

*184C.*
*(1)*    *Subject to subsection (3), the Court may, on the application of a member of a company, grant leave to that member to*
    *(a) bring proceedings in the name and on behalf of that company; or*
    *(b) intervene in the proceedings to which the company is a party for the purpose of continuing, defending or discontinuing the proceedings on behalf of the company.*
*(2)*    *Without limiting subsection (1), in determining whether to grant leave under that subsection, the Court must take the following matters into account*
    *(a) whether the member is acting in good faith;*
    *(b) whether the derivative action is in the interests of the company taking account of the views of the company's directors on commercial matters;*
    *(c) whether the proceedings are likely to succeed;*
    *(d) the costs of the proceedings in relation to the relief likely to be obtained; and*
    *(e) whether an alternative remedy to the derivative claim is available.*
*(3)*    *Leave to bring or intervene in proceedings may be granted under subsection (1) only if the Court is satisfied that*
    *(a) the company does not intend to bring, diligently continue or defend, or discontinue the proceedings, as the case may be; or*
    *(b) it is in the interests of the company that the conduct of the proceedings should not be left to the directors or to the determination of the shareholders or members as a whole.*
*(4)*    *Unless the Court otherwise orders, not less than twenty eight days' notice of an application for leave under subsection (1) must be served on the company and the company is entitled to appear and be heard at the hearing of the application.*

(5)    The Court may grant such interim relief as it considers appropriate pending the determination of an application under subsection (1).

(6)    Except as provided in this section, a member is not entitled to bring or intervene in any proceedings in the name of or on behalf of a company.

184D.

(1)    If the Court grants leave to a member to bring or intervene in proceedings under section 184C it shall, on the application of the member, order that the whole of the reasonable costs of bringing or intervening in the proceedings must be met by the company unless the Court considers that it would be unjust or inequitable for the company to bear those costs.

(2)    If the Court, on an application made by a member under subsection (1), considers that it would be unjust or inequitable for the company to bear the whole of the reasonable costs of bringing or intervening in the proceedings, it may order
(a) that the company bear such proportion of the costs as it considers to be reasonable; or
(b) that the company shall not bear any of the costs.

184E.

The Court may, at any time after granting a member leave under section 184C, make any order it considers appropriate in relation to proceedings brought by the member or in which the member intervenes, including
(a) an order authorising the member or any other person to control the proceedings;
(b) an order giving directions for the conduct of the proceedings;
(c) an order that the company or its directors provide information or assistance in relation to the proceedings; and
(d) an order directing that any amount ordered to be paid by a defendant in the proceedings must be paid in whole or in part to former and present members of the company instead of to the company.

184F.

No proceedings brought by a member or in which a member intervenes with the leave of the Court under section 184C may be settled or compromised or discontinued without the approval of the Court.

184G.

A member of a company may bring an action against the company for breach of a duty owed by the company to him as a member.

184H.

Where a member of a company brings proceedings against the company and other members have the same or substantially the same interest in relation to the proceedings, the Court may appoint that member to represent all or some of the members having the same interest and may, for that purpose, make such order as it thinks fit, including an order
(a) as to the control and conduct of the proceedings;
(b) as to the costs of the proceedings; and

6

*(c) directing the distribution of any amount ordered to be paid by a defendant in the proceedings among the members represented.*

*184I.*

*(1) A member of a company who considers that the affairs of the company have been, are being or are likely to be, conducted in a manner that is, or any act or acts of the company have been, or are, likely to be oppressive, unfairly discriminatory, or unfairly prejudicial to him in that capacity, may apply to the Court for an order under this section.*

*(2) If, on an application under this section, the Court considers that it is just and equitable to do so, it may make such order as it thinks fit, including, without limiting the generality of this subsection, one or more of the following orders*

*(a) in the case of a shareholder, requiring the company or any other person to acquire the shareholder's shares;*

*(b) requiring the company or any other person to pay compensation to the member;*

*(c) regulating the future conduct of the company's affairs;*

*(d) amending the memorandum or articles of the company;*

*(e) appointing a receiver of the company;*

*(f) appointing a liquidator of the company under section 159(1) of the Insolvency Act on the grounds specified in section 162(1)(b) of that Act;*

*(g) directing the rectification of the records of the company;*

*(h) setting aside any decision made or action taken by the company or its directors in breach of this Act or the memorandum or articles of the company.*

*(3) No order may be made against the company or any other person under this section unless the company or that person is a party to the proceedings in which the application is made."*

These sections were inserted into the BC Act pursuant to the BVI Business Companies (Amendment) Act, 2005. The relevant sections of the BVI Business Companies Act are attached hereto as **Exhibit 4.**

## BASIS OF THE TO-BE-FILED BVI PROCEEDINGS

9   In relation to a claim brought under section 184I, the Court will only make an order in Hornbeam's favour if the Court is satisfied on the evidence that the affairs the company have been, are being or are likely to be, conducted in a manner that is, or any act or acts of the company have been, or are, likely to be oppressive, unfairly discriminatory, or unfairly prejudicial to the complaining shareholder.

10   The sole asset of Halliwel is its shareholding in Warren Steel, and it will therefore be important for Hornbeam to adduce evidence of the mismanagement of those shares by Halliwel if it is to succeed in the 184I proceedings.  In addition such evidence of both the mismanagement, and the consequence of the mismanagement, will be important to the Court in determining what order it will make in the event that it is satisfied that the complaint has been established.

11   I have read the Declaration of Fabrizio N. Campanile. It is apparent to me from reading that Declaration that at base, the allegations in support of the 184I proceedings are that Kolomoisky, and Bogolubov, the other ultimate beneficial owners of Halliwel, have created a

7

scheme and artifice whereby they, through their other beneficially owned and controlled entities ("**related lenders**") have:

    a.  made secured loans to Warren Steel, Halliwel's sole asset; and

    b.  used the proceeds of such loans in schemes and transactions with "related trading partners" that were to the detriment of Warren Steel, resulting in a significant diminution in the value of Halliwel's shares.

It is Hornbeam's case that it, unlike Kolomoisky and Bogolubov, who retain the benefit of their status as lenders and related counterparties, has been and is being diminished without any compensation, in an oppressive, discriminatory and unfairly prejudicial manner.

12  Evidence that Mr. Symeou mismanaged Halliwel would assist Hornbeam's claim in BVI pursuant to s184I. Such evidence may be oral and/or may be documentary and will include (but not necessarily be limited to) evidence that Mr. Symeou was aware of, approved and/or failed to act properly in respect of:

    a.  loans made to Warren Steel which were to the detriment of Warren Steel, particularly in circumstances where the loans were made by Mr Kolomoisky and/or Mr Bogolubov or companies owned or controlled by them;

    b.  breaches of fiduciary duties of the management of Warren Steel which caused loss to Warren Steel; and

    c.  the misuse of any of the funds from the loans made to Warren Steel.

13  I am told by James Power of Holland & Knight, and it seems likely based on my review of the Campanile Declaration and exhibits thereto, that most of the evidence necessary to support these allegations will be located in the United States:

14  Virtually all of the "related" lenders in question are entities and natural persons incorporated or residing in the United States.  It would be very helpful to Hornbeam to be able to prove the allegation that these lenders are owned, beneficially owned, or otherwise controlled by Kolomoisky and Bogolubov, as well as prove the actual source of funds utilized by the related party lenders.  Doing to so will provide critical evidentiary support to the allegation that by virtue of the related lender transactions, the affairs of Halliwel are being conducted in an manner that is oppressive, unfairly discriminatory and prejudicial with respect to Hornbeam.

15  Similarly, the use (or misuse) of funds advanced to Warren Steel by Warren Steel's management, including but not limited to Mordechai Korf, occurred within the United States. The underlying evidence of Warren Steel's counterparty transactions, including both Warren Steel's and its "related" counterparties' original invoices, documentation, banking records and witnesses as to the same are all located within the United States.  Obtaining this evidence will provide important support to the allegation that by virtue of the related counterparty transactions, the affairs of Halliwel are being conducted in an manner that is oppressive, unfairly discriminatory and prejudicial with respect to Hornbeam.

16  The Harney's text at 8.396 provides some guidance on what would amount to unfairly prejudicial conduct pursuant to s184I:

*"As to 'unfairly prejudicial', the English Courts have held that the test of 'unfair prejudice' to minority shareholders is as follows [Re Bovey Hotel Ventures Ltd (31 July 1981, unreported)]: "The test of unfairness must, I think, be an objective, not a subjective one. In other words, it is not necessary for the petitioner to show that the persons who have had de facto control of the company have acted as they did in the conscious knowledge that this was unfair to the petitioner or that they were acting in bad faith; the test, I think, is whether a reasonable bystander observing the consequences of their conduct, would regard it as having unfairly prejudiced the petitioner's interests. Unfairness is a familiar concept employed in ordinary speech, often by way of contrast to infringement of legal right. It was intended to confer a very wide jurisdiction upon the Court and I think it would be wrong to restrict that jurisdiction by adding any gloss to the ordinary meaning of the words"...... the board will act unfairly if in asserting strict legal rights, it acts contrary to the equitable considerations arising at the time of the commencement of the relationship or subsequently: 'there will be cases in which equitable considerations make it unfair for those conducting the affairs of the company to rely on their strict legal powers. Thus unfairness may consist in a breach of the rules or in using the rules in a manner which equity would regard as contrary to good faith' [O'Neill v Phillips [1999] 2 BCLC 1]"* A copy of Harney's text at 8.396 is attached hereto as **Exhibit 5.**

17  There are two English authorities, which are likely to be persuasive to a Judge in the BVI, in which the English Courts have considered that serious mismanagement or non-management can constitute unfairly prejudicial conduct – see Warner J, in <u>Re Elgindata Ltd</u> [1991] BCLC 959 and <u>Re Macro (Ipswich) Ltd</u> [1994] 2 BCLC 354. Copies of these two cases are attached hereto as **Exhibit 6** and **Exhibit 7** respectively**.**

18  If the Court finds that unfairly prejudicial conduct is established, it is entitled to "any order as it thinks fit" to remedy the position. The Court will tailor the remedies granted to a claimant to the unfairly prejudicial, oppressive, unfairly discriminatory, or unfairly prejudicial conduct found to have occurred.

19  The Court may, inter alia:

   a.  order the company or any other person to acquire the shareholder's shares if the court considers it just and equitable to do so (section 184I(2)(a)). If the Court is to make such a "buy-out" order then the Court will need to ascribe a value to the shares being acquired. In my experience, this is the order which the Court most often makes if unfairly prejudicial conduct is established, and the Court frequently determines a value that the shares would have had but for the unfairly prejudicial conduct;

   b.  make an order regulating the future conduct of the company's affairs. Given that the sole asset of Halliwel is the shareholding in Warren Steel, the most likely order that the Court could make if it was minded to proceed down this route would be to direct Halliwel as to how to vote its shares in Warren Steel.  In order to make any sensible order as to how to vote shares, the Court would need to be informed as to the business and affairs of Warren Steel.

20  Hornbeam would be well advised to produce, and in my opinion the Court would expect to see, a complete accounting and valuation of the shares of Warren Steel.  The valuation should seek to establish the value of the shares at the present time, and the value that the

shares would have had but for the actions giving rise to the complaint.  Such valuation is relevant both to the question as to whether there was unfair prejudice, and to the question of what remedy is appropriate if unfair prejudice is found to have occurred.  It will be particularly relevant for the purposes of fixing an appropriate price if the Court is minded to require Hornbeam's shares in Warren Steel to be acquired by the other shareholders. of found to be unfairly prejudicial.

21   Hornbeam alleges serious and significant malfeasance.  In those circumstances, it is likely that if the claim is successful a significant portion of Warren Steel's assets will consist of claims against Warren Steel's management, related lenders and related counterparties for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and fraudulent transfer, respectively.  Evidence concerning legitimacy (or illegitimacy) of the current debts on Warren Steel's balance sheet must be assessed and analyzed within the To-Be-Filed BVI Proceeding(s) to determine both the actual value of Halliwel's shares, and the value which should be paid for those shares in the event that an order requiring the purchase of such shares is made.

22   The evidence related to the valuation of Warren Steel, both with respect to its physical business and other hard assets, legitimate and illegitimate debts, as well as its claims against third parties, is likely to be located in the United States.

## ABILITY TO OBTAIN EVIDENCE IN BVI PROCEEDINGS

23   It is important to note that at the present time there are no ongoing proceedings in the BVI Court.

24   The BVI Rules of Civil Procedure do not provide any system of pre-action discovery.  In the circumstances:

   a.   there is no ability to seek discovery from the BVI Courts at the present time in respect of the intended 184I proceedings;

   b.   discovery would only be available from the BVI Court once proceedings have been commenced.

25   Discovery in the BVI is significantly more limited than has been my experience of discovery in the United States.

26   Discovery would be governed by Rule 28 of the Civil Procedure Rules[1] ("**CPR**"). The general principle is set out in CPR 28.2 to 28.4 as follows:

*28.2 - Duty of disclosure limited to documents which are or have been in party's control*
   *(1)   A party's duty to disclose documents is limited to documents which are or have been in the control of that party.*
   *(2)   For this purpose a party has or has had control of a document if –*
      *(a)   it is or was in the physical possession of the party;*
      *(b)   the party has or has had a right to inspect or take copies of it; or*
      *(c)   the party has or has had a right to possession of it.*

---

[1] The 184I proceedings would be subject to the Insolvency Rules.  The Insolvency Rules do not themselves contain any relevant provisions dealing with discovery but IR4 incorporates, inter alia the discovery rules contained in the Civil Procedure Rules.

*28.3 - Disclosure of copies*

    (1)    *Except where required by paragraph (2)) a party need not disclose more than one copy of a document.*

    (2)    *A party must however disclose a copy if it contains a modification, obliteration or other marking or feature which is not present in the original or any copy of the document which is being disclosed.*

*28.4 - Standard Disclosure*

*If a party is required by any direction of the court to give standard disclosure, that party must disclose all documents which are directly relevant to the matters in question in the proceedings.*

27    It follows that in any proceedings in the BVI:

    a.   discovery is limited to documents only;

    b.   there is no concept of discovery by oral deposition; and

    c.   there is no discovery against non-parties.

28    However, there is no rule of BVI evidence that would prevent discovery obtained under 28 U.S.C. § 1782 being used in BVI proceedings[2].  As such, Hornbeam is free to engage in discovery outside the BVI to obtain documents and other evidence to support its To-Be-Filed BVI Proceeding(s).It is apparent from the Campanile Declaration that Hornbeam wishes to make serious allegations of inter alia fraud and/or dishonesty against the controlling minds of Halliwel.   There are very stringent obligations on BVI Counsel relating to pleading allegations of fraud and/or dishonesty, and full particulars of the fraud must be pleaded and Counsel must be satisfied that there are good grounds to plead the fraud and/or dishonesty. Based on my general knowledge of U.S. law, it is my understanding that pleading fraud in the BVI is more onerous than pleading fraud in the U.S.  The task of compiling with that obligation may be significantly easier if discovery supporting Hornbeam's claims is obtained in the U.S. under 28 U.S.C. § 1782.

29    Finally, armed with largely the same information set forth above, Hornbeam intends to commence a 184I proceeding seeking to have the above-mentioned claims valued and ultimately seeking a buyout order.  As such, I am advised that Hornbeam intends to further investigate and obtain discovery (specifically regarding the *proper* valuation of Halliwel's sole asset, Warren Steel) in the U.S. to, among other things, provide the BVI Court with a complete accounting and valuation (both at present time and the value that the shares would have had but for the actions giving rise to the complaint) of the shares of Warren Steel.  For the reasons discussed above, Hornbeam is well advised to do so prior to filing a new application commencing a 184I proceeding.  In the alternative to filing the 184I proceeding, Hornbeam is free to commence another liquidation proceeding so as to prove that "*The controlling minds of the Respondent, Halliwel Assets Inc (**"Halliwel"**) (Mr Panikos Symeou (**"Mr Symeou"**) and/or Mr Igor Kolomoisky and/or Mr Genady Bogolubov) have proved*

---

[2] Section 184C BC Act provides that a registered shareholder may seek leave to bring a claim against a director of a company derivatively. Such a claim could be for example for breach of directors' duties. Hornbeam will only obtain leave pursuant to section 184C to bring proceedings on behalf of Halliwel against Mr Symeou for breach of directors' duties if (in addition to satisfying the other requirements of the section) Hornbeam satisfied the Court that there is evidence of the same.

*themselves to be dishonest, deceitful and willing to act in a fraudulent manner to further their own agenda. Halliwel's assets (being the shares in Warren Steel Holdings Inc) are at serious risk while Halliwel is under the control of Mr Symeou."*

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:          Tortola, British Virgin Islands
                18 December 2014

*Michael J. Fay*
_____
MICHAEL JOHN FAY

12

Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                        :
IN RE:                                                  :
                                                        :          14 Misc. 424 (Part 1)
APPLICATION OF HORNBEAM CORP.       :
                                                        :                <u>ORDER</u>
                                                        :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12/24/2014__

VERNON S. BRODERICK, United States District Judge:

      Hornbeam Corporation ("Hornbeam") applies *ex parte* for an Order pursuant to 28

U.S.C. § 1782 authorizing it to obtain discovery from banks and professional service providers

within the Southern District of New York for future use in foreign litigation.  (Doc. 1.)  For the

reasons stated below, Hornbeam's Application is GRANTED.

      **I.**      <u>**Background**</u>[1]

      In 2001, Vadim Shulman ("Shulman"), Igor Kolomoisky ("Kolomoisky"), and Genady

Bogolubov ("Bogolubov") entered into a joint venture to purchase a steel factory in Warren,

Ohio.  (*See* Campanile Decl. ¶¶ 30-35, 48-54.)[2]  They formed Warren Steel Holdings, LLC

("Warren Steel"), a Delaware entity, to own the factory.  (*Id.* ¶ 36.)  Their initial intention was to

dismantle the factory, move it to Ukraine, and resume its operations there, but in 2006, Shulman,

Kolomisky, and Bogolubov changed their plans and decided to resume operations at the plant in

Ohio rather than dismantle it.  (*Id.* ¶¶ 48, 55-56.)  To facilitate this endeavor, they incorporated

Halliwel Assets Inc. ("Halliwel"), a British Virgin Islands ("BVI") business company.  (*Id.* ¶ 58.)

Halliwel is the sole member of Warren Steel.  (*Id.*)  In turn, Shulman, Kolomoisky, and

---
[1] The following is only a brief summary of background information to provide some context for this Order.  I make
no findings of fact.
[2] "Campanile Decl." refers to the Declaration of Fabrizio N. Campanile in Support of *Ex Parte* Application for
Discovery Pursuant to 28 U.S.C. § 1782.  (Not filed on ECF.)

Bogolubov each ultimately own a one-third interest in Halliwel through intermediaries they control.  (*Id.* ¶ 61.)  Shulman is the ultimate beneficial owner of Hornbeam, which owns Shulman's one-third stake in Halliwel.  (Shulman Decl. ¶ 1.)[3]

At some point, Shulman's relationship with Kolomisky became severely strained by a business dispute.  (*Id.* ¶ 26; *see also* Campanile Decl. ¶¶ 122-27.)  Shulman alleges that Kolomoisky and Bogolubov began to engage in self-dealing and breached the joint venture agreement by causing Warren Steel to accept loans secured by Warren Steel's assets and revenues from entities ("the Related Parties") controlled by Kolomoisky and Bogolubov and their allies.  (*See* Campanile Decl. ¶¶ 9-16; Shulman Decl. ¶¶ 30-33.)  In all instances, the same person—Mordecai Korf ("Korf"), the president of Warren Steel—executed the loan documents on behalf of both the lender, a Related Party, and the borrower, Warren Steel.  (Campanile Decl. ¶ 13.)  In short, Kolomisky and Bogolubov have allegedly taken control of Halliwel for their own purposes and endeavored to harm Shulman by saddling Warren Steel with debt and obtaining a priority security interest in its assets.

Hornbeam has previously initiated two actions in the BVI related to this dispute.  First, in August 2014, Hornbeam sought an *ex parte* injunction against Halliwel and others to enjoin an extraordinary general meeting of Halliwel's shareholders at which a restructuring of Warren Steel's debt was expected to be approved.  (Fay Decl. ¶¶ 8a-8d.)[4]  The injunction was granted but then dismissed as moot when it was discovered that the restructuring had already been approved at another time.  (*Id.* ¶¶ 8d-8e.)  Second, in October 2014, Hornbeam applied for the appointment of a liquidator of Halliwel under the BVI Insolvency Act; the application was later

---

[3] "Shulman Decl." refers to the Declaration of Vadim Nathan Shulman in Support of *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782.  (Doc. 3-1.)
[4] "Fay Decl." refers to the Declaration of Michael John Fay in Support of *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782.  (Doc. 3-2.)

voluntarily withdrawn, due in part to a "lack of adequate disclosure regarding the underlying claims." (*Id.* ¶¶ 8g-8k.) Hornbeam now intends to initiate proceedings in the BVI based upon a cause of action under the BVI Business Companies Act for oppression of minority shareholders. (*See* Campanile Decl. ¶¶ 128-140; Fay Decl. ¶¶ 9-22.)

Hornbeam filed the instant *ex parte* Application on December 19, 2014. (Doc. 1.) Hornbeam requests that I authorize it to issue subpoenas to twelve banks—Bank of America N.A.; Bank of NY Mellon; BNP Paribas S.A.; Citibank N.A.; Commerzbank AG; Deutsche Bank AG; HSBC Bank (USA) NA; JP Morgan Chase Bank N.A.; Royal Bank of Scotland PLC; Standard Chartered Bank; UBS AG; Wells Fargo Bank, N.A. (collectively, the "New York Banks" or "Banks")—for the production of documents. Hornbeam's original request sought "[c]opies of any orders, instructions or wire transfers received from a payor/transferor bank to a payee/transferee bank for the benefit or credit of, or with any reference to": Warren Steel; Halliwel; the Related Parties; four individuals and entities that Hornbeam intends to sue in the BVI, including Kolomisky and Bogolubov; eight entities that Kolomisky, Bogolubov, and Korf allegedly use as conduits to invest money in the United States; and four entities allegedly involved with the initial purchase of the steel factory.[5] (Doc. 1 at 8-11.) The original request also sought "the full records" of any bank accounts belonging to most of the foregoing individuals and entities. (*Id.* at 10.) Hornbeam also wishes to subpoena White & Case LLP, KPMG LLC, and PricewaterhouseCoopers LLP (collectively, the "Professional Service Providers") for documents relating to the structure, valuation, and past transactions of the Related Parties and Warren Steel. (*Id.* at 11-12.)

After reviewing the materials in support of the Application, I ordered Hornbeam's

---

[5] With respect to most of these entities and individuals, Hornbeam sought records only for those transactions in which the Banks "acted as intermediary banks." (*See* Doc. 1 at 8-11.)

counsel to appear at a hearing on December 23, 2014 to discuss, inter alia, whether the requested discovery was unduly burdensome and whether there was a sufficient nexus between the underlying dispute and the entities from and about which discovery was requested. (*See* Doc. 4.) At the hearing, counsel explained that discovery was sought from the New York Banks only because they serve as intermediaries for wire transfers of funds from outside the United States to within the United States, and not because the subject individuals or entities were likely to maintain accounts at the Banks. Although counsel did not know which of the New York Banks had actually processed transactions for the subject individuals and entities, counsel stated, on the basis of his experience, that these were the Banks most likely to provide such services.[6]

Counsel represented that the New York Banks routinely receive and comply with similar subpoenas issued pursuant to 28 U.S.C. § 1782. In response to subpoenas containing similar language, the Banks have searched their electronic transaction databases for the relevant terms and have timely provided counsel with simple electronic spreadsheets listing basic information relating to any wire transfers that satisfy the search parameters. Counsel provided examples of subpoenas issued and spreadsheets produced in other cases for my inspection at the hearing. Counsel explained that similar spreadsheets would satisfy the substance of Hornbeam's discovery requests in this case.

I advised counsel at the hearing that I was not prepared to grant the Application at that time. I explained that Hornbeam's proposed order appeared to request many more documents with a broader scope than the spreadsheets that counsel represented would be satisfactory. I advised counsel to revise the language of Hornbeam's proposed order to describe more narrowly and more precisely the material that would satisfy the substance of its requests. *See Schmitz v.*

---

[6] Counsel also indicated that they did not include other banks that provide such services, such as Chinese banks, because they are not aware of any transactions involving China or its currency.

*Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79, 85 (2d Cir. 2004) (expressing a "preference for narrowly tailored discovery orders where possible," in lieu of the outright rejection of applications under § 1782). Shortly after the hearing, counsel provided me with a revised proposed order. The revised proposed order requests only "wire transfer record[s]" for transactions in which the New York Banks served as intermediaries, (Revised Proposed Order ¶¶ 2A-2F),[7] rather than requesting "[c]opies of any orders, instructions or wire transfers" pertaining to such transactions. The revised proposed order also omits any request for account information or records.

## II.    **Analysis**

I conduct the following analysis on the basis of the record currently before me, mindful that the state of the relevant foreign proceedings may be "continually in flux" and that I may need to revisit my rulings if "appropriate circumstances arise in the future." *Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6, 8 (2d Cir. 2014) (summary order). I also reserve the right to revise my conclusions if any subpoenaed party moves to quash the subpoena or vacate this Order and presents additional evidence bearing on the factors that inform my exercise of discretion.

When reviewing an application for discovery related to a foreign proceeding under 28 U.S.C. §1782, I must first determine whether I have the authority to grant the request. I am authorized to grant a § 1782 request if: (1) the person from whom discovery is sought resides or is found in the district where the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or an "interested person." *Schmitz*, 376 F.3d at 83. The proceeding before a foreign or

---

[7] This document is not filed on ECF.

international tribunal need not be ongoing or imminent; a dispositive ruling must merely be
within "reasonable contemplation." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241,
259 (2004).

Based upon the papers submitted, the threshold requirements are satisfied here. The
Banks and Professional Service Providers from which Hornbeam seeks discovery are located
within the Southern District of New York. (*See* Doc. 3 ¶ 4.) Hornbeam initiated two legal
proceedings in the BVI related to the underlying dispute over Warren Steel, and it intends to
initiate further proceedings once it obtains additional information. The material Hornbeam seeks
to discover is potentially critical to those proceedings because it is relevant to whether
Kolomisky and Bogolubov controlled the Related Parties or provided the funds that the Related
Parties loaned to Warren Steel. Evidence that Kolomisky and Bogolubov controlled or funded
the entities that obtained a security interest in Warren Steel's assets would "provide critical . . .
support" to Hornbeam's anticipated claim that it has been oppressed and discriminated against as
the minority shareholder in Halliwel. (Fay Decl. ¶ 14.) Hornbeam therefore seeks evidence for
use in foreign proceedings in which a dispositive ruling is within reasonable contemplation. *See
In re Wilhelm*, 470 F. Supp. 2d 409, 411 (S.D.N.Y. 2007); *In re Servicio Pan Americano de
Proceccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) ("Section 1782 may be invoked even
where foreign legal proceedings are not even underway . . . ."). Finally, Hornbeam is plainly an
interested person in the foreign proceedings it expects to initiate.

"[O]nce the statutory requirements are met, a district court is free to grant discovery in its
discretion." *In re Application for an Order Permitting Metallgesellschaft AG To Take
Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). To determine whether to exercise my discretion to
grant the request, I must consider four factors: (1) whether the person from whom discovery is

6

sought is not a participant in the foreign proceeding and is therefore outside the foreign tribunal's jurisdictional reach; (2) the nature of the foreign tribunal and its receptivity to judicial assistance by U.S. federal courts; (3) whether the request conceals an attempt to circumvent foreign evidence-gathering rules; and (4) whether the request is unduly intrusive or burdensome.  *See Intel*, 542 U.S. at 264-65; *Mare Shipping*, 574 F. App'x at 8.

First, the New York Banks and Professional Services Providers are not expected to be parties to any future BVI litigation.  Especially in light of the BVI's relatively restrictive discovery practices, which are largely limited to obtaining documents from parties to the litigation, (*see* Fay Decl. ¶¶ 25-27), there is no reason to believe that documents in the possession of the New York Banks or Professional Service Providers would be within the jurisdictional reach of the BVI courts.  *In re Application of OOO Promnefstroy for an Order To Conduct Discovery for Use in a Foreign Proceeding*, Misc. No. 19-99, 2009 WL 3335608, at *5 (S.D.N.Y. Oct. 15, 2009).  This factor weighs in favor of granting Hornbeam's Application.  *See Intel*, 542 U.S. at 264.

Second, Hornbeam has provided the declaration of a respected practitioner of BVI law that there is no legal barrier to the use of documents obtained under 28 U.S.C. § 1782 in BVI proceedings.  (Fay Decl. ¶ 28.)  Hornbeam need not "affirmatively show" that the BVI courts are receptive to U.S. judicial assistance; the burden is on the opponent of a § 1782 request to prove that the foreign court would reject the evidence obtained through § 1782.  *OOO Promnefstroy*, 2009 WL 3335608, at *7.  The BVI courts are at least not obviously unreceptive to my assistance.  *Cf. In re Microsoft Corp.*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006) (relying on foreign tribunal's express objection to conclude that it was not receptive to the assistance of the U.S. federal courts).  Under these circumstances, I should err on the side of permitting the

requested discovery.  *See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100-01 (2d Cir.

1995).

Third, Hornbeam's request does not conceal an attempt to circumvent foreign evidence-

gathering rules.  As an initial matter, nothing is "conceal[ed]"; Hornbeam is forthright that BVI

discovery rules, like most countries', are less permissive than those in the United States.  (*See*

Fay Decl. ¶¶ 25-27.)  In any event, there is no requirement under § 1782 that the requested

material be discoverable under the rules governing the litigation in the foreign jurisdiction.  *See*

*Intel*, 542 U.S. at 261; *Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 98 (2d Cir. 2009)

(summary order).  Because there is no reason to believe that Hornbeam's effort to obtain

materials not discoverable in the BVI through § 1782 would undermine "principles of comity" or

"cooperation" with the BVI, this factor weighs in favor of—or at least not against—granting

Hornbeam's Application.  *See In re Microsoft*, 428 F. Supp. 2d at 196.

Fourth, I conclude that the discovery Hornbeam seeks is not unduly intrusive or

burdensome.  Although I was initially concerned that Hornbeam's requests to the New York

Banks were significantly overbroad, counsel provided assurances and examples of the Banks'

routine compliance with previous similar requests.  Counsel then narrowed Hornbeam's requests

to exclude unnecessary "orders" and "instructions" pertaining to wire transfers and irrelevant

account information.  Therefore, I am persuaded that the wire transfer spreadsheets Hornbeam

seeks from the New York Banks are a "specific, discrete set of documents that are easily

identifiable."  *In re Berlamont*, No. 14-mc-00190, 2014 WL 3893953, at *2 (S.D.N.Y. Aug. 4,

2014).  I may also weigh the probative value of the requested materials in considering whether

the requests are unduly burdensome.  *See In re Application Pursuant to 28 U.S.C. Section 1782*

*of Okean B.V. & Logistic Solution Int'l To Take Discovery of Chadbourne & Parke LLP*, --- F.

8

Supp. 3d ----, 2014 WL 5090028, at *9, *13 (S.D.N.Y. 2014). The requested documents may be highly probative because they may establish that Kolomisky and/or Bogolubov controlled or funded the Related Parties that allegedly obtained a security interest in Warren Steel's assets. Finally, although requests for privileged material may be unduly intrusive, and § 1782 "expressly shields privileged material," *In re Microsoft*, 428 F. Supp. 2d at 196, Hornbeam's requests to the Professional Service Providers expressly exclude privileged documents. For these reasons, on the basis of the existing record, I conclude that Hornbeam's requests are not unduly intrusive or burdensome.

Because all of the factors guiding my exercise of discretion weigh in favor of granting Hornbeam's Application, I choose to do so.

### III.   Operative Provisions of the Order

For the foregoing reasons, Hornbeam's *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782, (Doc. 1), is GRANTED. It is hereby ordered that:

1.   Hornbeam Corporation is authorized to issue and serve subpoenas on Bank of America N.A., Bank of NY Mellon, BNP Paribas SA, Citibank N.A., Commerzbank AG, Deutsche Bank AG, HSBC Bank (USA) NA, JPMorgan Chase Bank N.A., Royal Bank of Scotland PLC, Standard Chartered Bank, UBS AG, and Wells Fargo Bank, N.A. (collectively, the "**New York Banks**") for the production of the following documents:

    A.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where Warren Steel Holdings LLC, commonly referred to as "Warren Steel" ("**Warren Steel**"), is an originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>.

    B.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where Halliwel Assets Inc., commonly referred to as "Halliwel" ("**Halliwel**"), is an originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>.

    C.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where any of the following entities and/or individuals that allegedly have provided loans to Warren Steel (the "**Related Parties**") is an

originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>:

      i.     Divot Enterprises Limited;
      ii.    5251 36th Street LLC;
     iii.   CC Metal and Alloys LLC;
     iv.   Felman Trading, Inc.;
      v.    Mordechai Korf, also Motti Korf;
     vi.   Optima Acquisitions, LLC;
    vii.   Optima Fixed Income LLC;
   viii.  Optima Group LLC;
     ix.   Optima International of Miami, Inc.;
      x.    Optima Ventures, LLC;
     xi.   Querella Holdings Limited; or
    xii.   Felman Production, LLC.

D.     Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where any of the following entities and/or individuals that allegedly will be adverse to Hornbeam in the contemplated foreign proceedings is an originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>:

      i.     A Marigold Trust Company Limited;
      ii.    Panikos Symeou;
     iii.   Igor Kolomoisky, a/k/a Igor Kolomoiskiy; or
     iv.   Genady Bogolubov, a/k/a Gennadiy Bogolyubov.

E.     Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where any of the following entities and/or individuals that allegedly are used by Kolomoisky and/or Bogolubov and/or Korf as conduits to invest money in the United States is an originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>:

      i.     Georgian American Alloys, Inc.;
      ii.    Privat Intertrading a/k/a ZAO Privat Intertrading;
     iii.   Privat Group;
     iv.   Haftseek Investments Ltd.;
      v.    GM Georgian Manganese Holdings Ltd.;
     vi.   Georgian Manganese, LLC;
    vii.   Optima Industrial Management, LLC; or
   viii.  Vartsikhe 2005, LLC

F.     Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where any of the following entities and/or individuals that were associated with the original purchase of the steel factory currently operated

by Warren Steel is an originator, beneficiary, or is otherwise referenced in the wire transfer for the period beginning January 1, 2001 to the present:

     i.    Akiva Sapir;
    ii.    Plama Limited;
   iii.    Instrad Limited; or
   iv.    CSC Ltd.

2.    Hornbeam Corporation is authorized to issue and serve subpoenas on White & Case LLP, KPMG LLC, and PricewaterhouseCoopers LLP (collectively, the "**Professional Service Providers**"), for the production of the following, to the extent they are not legally privileged documents:

A.    Each Related Party's Articles of Incorporation and By Laws, including any amendments thereto, as well as all Documents and Communications concerning the same.

B.    Any Corporate Resolutions, Minutes, Due Diligence Reports or other materials concerning any loan or line of credit extended to Warren Steel from January 1, 2006 to the present.

C.    Each Related Party's Corporate Organization Chart, as well as all Documents and Communications concerning the same.

D.    All Documents and Communications, concerning any transaction, loan, agreement, contract, invoice or understanding with Warren Steel from January 1, 2006 to the present.

E.    All Documents and Communications, concerning any transaction, loan, agreement, contract, invoice or understanding with a Related Party from January 1, 2006 to the present.

F.    All Documents and Communications concerning all loans and credit transactions to which Warren Steel is a party from January 1, 2006 to the present.

G.    All Documents and Communications concerning all loans and credit transactions to which any of the Related Party is a party from January 1, 2006 to the present.

H.    Documents and Communications that are or are concerning internal or external valuations, appraisals, liquidation analyses, fairness or solvency opinions, or other documents concerning the value of the liabilities of Warren Steel from January 1, 2006 to the present.

I.    Documents and Communications that are or are concerning internal or external valuations, appraisals, liquidation analyses, fairness or solvency opinions, or other

documents concerning the value of the liabilities of any of the Related Parties from January 1, 2006 to the present.

    J.    Communications concerning, referencing, describing, discussing, from or to (including carbon copies and blind carbon copies) Warren Steel from January 1, 2006 to the present.

3.    The New York Banks and the Professional Service Providers shall produce the documents requested in their respective subpoenas within twenty-one (21) days of service of the subpoena and as required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York.

4.    Until further Order by this Court, the New York Banks and the Professional Service Providers shall preserve documents and evidence, electronic or otherwise, in their possession, custody, or control that contain information potentially relevant to the subject matter of Hornbeam's document request as described in this Order.

5.    The Court shall retain jurisdiction over the matter for the purpose of enforcing this Order, as appropriate, and assessing any supplemental request for discovery assistance by Hornbeam.

6.    A copy of this Order shall be served with each discovery demand.

SO ORDERED.

Dated:    December 24, 2014
           New York, New York

Vernon S. Broderick
United States District Judge