## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE APPLICATION OF )
HORNBEAM CORPORATION )
) C.A. No.
REQUEST FOR DISCOVERY PURSUANT )
TO 28 U.S.C. § 1782 )
)

### DECLARATION OF FABRIZIO N. CAMPANILE IN SUPPORT OF
### *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

I, FABRIZIO N. CAMPANILE, of Goldauerstrasse 8, CH-8006 Zurich, Switzerland,

declare as follows:

1.     I am an attorney-at-law admitted to the bar of Zurich, Switzerland in the year 2000.

2.     I make this Declaration in support of the application of Hornbeam Corporation, including

any assignee or successor-in-interest ("**Hornbeam**"), to the U.S. District Court for the District of

Delaware pursuant to 28 U.S.C. § 1782 (the "**1782 Application**") seeking discovery with respect

to witnesses and documents located in the United States and in this judicial district for use in the

following foreign proceedings:

    (i) the contemplated litigation against Halliwel Assets Inc. ("**Halliwel**"), and its other

    shareholders Marigold Trust Company Limited ("**Marigold**"), and Mr. Panikos Symeou

    ("**Symeou**"), as agent/trustee for Mr. Igor Kolomoisky ("**Kolomoisky**") for violation of

    the BVI Business Companies Act of 2004, including, without limitation, an accounting,

    valuation, shareholder oppression, and buyout, that will be filed in the Commercial

    Division of the High Court of Justice, British Virgin Islands (the "**BVI Shareholder**

    **Action**") by Hornbeam and/or Tectum Trust Management Establishment ("**Tectum**"),

Hornbeam's assignee or successor-in-interest to the shares of Halliwel previously held by Hornbeam[1];

(ii) the contemplated litigation by Mr. Vadim Shulman ("**Shulman**") or one of the entities to which he is the ultimate beneficial owner, like Hornbeam or Tectum, against Symeou, in both his capacity as the Director of Halliwel and Secretary of Warren Steel Holdings, LLC ("**Warren Steel**"), in a jurisdiction currently unknown,[2] for breach of contract, fiduciary duties, and other duties associated with his positions, as well as for other extra-contractual liabilities (the "**Symeou Action**"); and

(iii) the contemplated litigation by Shulman, or one of his entities to which he is the ultimate beneficial owner, against Kolomoisky and/or Mr. Genady Bogolubov ("**Bogolubov**"), or one or more of their entities to which either or both are the ultimate beneficial owner(s), in a jurisdiction currently unknown for breach of the Joint Venture Agreement (defined below) arising from Kolomoisky's and Bogolubov's failure to compensate Shulman for his initial investments, including, without limitation, Shulman's purchase of the Steel Factory (defined below) for $13.5 million and his further roughly $15 million investment in the Steel factory, as Kolomoisky and Bogolubov had agreed (the "**Joint Venture Action**").

3.      When these proceedings are discussed collectively herein, I shall refer to the Shareholder Action, the Symeou Action, and the Joint Venture Action jointly as the "**Actions**".

---

[1] As of 12 October 2014, Halliwel's shares that were previously held by Hornbeam have been transferred to Tectum.  However, this transfer has not yet been formally recorded or expressly approved by Halliwel.

[2] While the proper place of jurisdiction for this reasonably contemplated claim is currently unknown, it is likely that this claim will be pursued in either the BVI or Cyprus or both.

4.     I am fully familiar with the facts of this case, as I have been investigating the subject matter of the Actions and other potential litigation for approximately two and a half years.

5.     I am fully authorized to make this Declaration by Hornbeam, Tectum, and Shulman, the ultimate beneficial owner of Hornbeam and Tectum. The statements contained herein are true to the best of my knowledge and belief. Aside from where otherwise indicated, facts contained herein are based upon personal knowledge or upon my interview with Shulman as well as my review of the relevant documentation, including but not limited to the multiple sworn affidavits and exhibits thereto that were submitted in the liquidation proceeding by Hornbeam against Halliwel that was brought before the Commercial Division of the High Court of Justice, British Virgin Islands (the **"BVI Court"**), entitled *In the Matter of Halliwel Assets Inc.*, Matter No. BVIHC (COM) 2014/134 (the **"BVI Liquidation Proceeding"**) as well as the correspondence with the involved parties. The BVI Liquidation Proceeding was withdrawn by consent between the parties. As such, Hornbeam may issue a further Originating Application.

## THE PARTIES AND BASIC FACTS

6.     While there are multiple entities and individuals involved in the interrelated Actions, which will be further discussed below, this dispute is really between three individuals: Shulman, Kolomoisky, and Bogolubov (the **"Principals"**).

7.     In essence, the dispute can be described as follows: Shulman, via entities which he controlled, purchased for $13.5 million the assets and property of a United States steel factory. These assets were later transferred into Warren Steel, a Delaware limited liability company. After the initial purchase of the steel factory, Shulman, via entities which he controlled, continued to make payments directly or indirectly for the benefit of Warren Steel. These payments were for the costs, maintenance, and upkeep of the facility. In 2006, a $90 million

3

credit line was opened by Divot Enterprises Limited ("**Divot**"), an entity controlled by Kolomoisky, for the benefit of Warren Steel. The $90 million consisted of $30 million that Kolomoisky allocated as part of Shulman's share of the expected future profits[3] from a separate joint venture which involved Roman Abramovich ("**Abramovich**") and $60 million brought by Kolomoisky and Bogolubov.

8.      Based on the documents that I have seen, $86,679,998.05 of the $90 million credit line has been drawn down.  $84,391,551,40 of the drawn down amount was a direct contribution to Warren Steel.  The $86,679,998.05 has been converted into equity of Halliwel in equal parts for the ultimate benefit of the Principals, including Shulman.

9.      Aside from this equity contribution, it has been discovered that loans to Warren Steel from parties related to the other Principals, but not Shulman, have been made in excess of $106 million.[4] The BVI Shareholder Action and the Symeou Action ultimately arise from these loans.

10.      The "related" or "connected parties" are Mordechai Korf ("**Korf**"), the President of Warren Steel, and the other entities that are owned or controlled by Korf, Kolomoisky, or Bogolubov, and their affiliates, including, but not limited to, Divot, 5251 36th Street LLC, CC Metal and Alloys LLC, Felman Trading, Inc., Mordechai Korf, Optima Acquisitions, LLC, Optima Fixed Income LLC, Optima Group LLC, Optima International of Miami, Inc., Optima Ventures, LLC, Querella Holdings Limited, and Georgian American Alloys, Inc.

---

[3] I understand that in the subsequent years, Shulman's share of the expected future profits from the Abramovich deal materialized in excess of the $30 million that Kolomoisky allocated to the Investment Agreement on Shulman's behalf in 2006.

[4] The $106 million is calculated as follows: (a) $62,160,895.90 in the table provided during the restructuring; (b) additional $19,335,000 not reflected in the table that was allegedly paid back for loans extended by Optima Acquisitions, LLC between May 14, 2009 and December 17, 2011 A Copy of the loan agreement indicating the status of these loans is attached hereto as **Exhibit 2**; (c) an additional $25 million extended by Optima Acquisitions LLC.

11.     In 2012, Shulman was informed of the existence of only roughly $18 million of related-party loans, which was planned to be converted in the same manner of the original capitalization of the Divot loans into equity of Halliwel: equal parts for the ultimate benefit of the Principals. Email correspondence from 2012 is attached hereto as **Exhibit 1**. This never occurred. I later discovered that the actual amount of the related-party loans was much greater than the amount voluntarily disclosed.

12.     As described in greater detail below, these related-party loans, by themselves, decreased the value of Halliwel's shares. However, only Hornbeam was hurt by this decrease because the other ultimate beneficial owners of Halliwel, Bogolubov and Kolomoisky (the **"Other Ultimate Beneficial Owners"**), were the ultimate beneficial owners of the secured lenders in these transactions.

13.     In respect of all related-party loans, Korf executed the loan documents on behalf of both the lenders and the borrower Warren Steel. These lenders were nominally owned by Korf and ultimately beneficially owned by the Other Ultimate Beneficial Owners - however, not by Shulman. In some of the agreements Korf even appears personally as a lender to Warren Steel.

14.     Pursuant to Warren Steel's Operating Agreement, the express consent of its member Halliwel was required for Korf as president of Warren Steel to enter into transactions over $100,000. Despite my requests for documentation concerning Halliwel and Warren Steel, I have never seen any such consents, save for the blanket ratification in the debt-restructuring agreement described below.

15.     This lack of consent and notice resulted in Shulman and Hornbeam being kept in the dark as to the extent of these interested transactions.

16.     In connection with the debt-restructuring described below, which resulted in an

emergency BVI Liquidation and Injunctive Applications, the related-party loans totaling roughly

$62 million now enjoy security interest in Warren Steel's assets and revenues.

### THE COVERT RESTRUCTURING OF WARREN STEEL'S DEBTS AND THE PROPOSED BUT NEVER HELD EGM

17.     The magnitude and the intent of this long-running, self-dealing, debt-accumulation

scheme was uncovered based on the documents provided on August 4, 2014 in connection with a

proposed debt-restructuring of Warren Steel.

18.     On August 1, 2014 Hornbeam was made aware of what was purported to be a *proposed*

complex debt-restructuring agreement by an email.

19.     The August 1, 2014 email included a Shareholder Notice setting an extraordinary general

meeting ("**EGM**") for the shareholders of Halliwel to be held on August 8, 2014 in order to

approve the *proposed* restructuring agreement as well as the appointment of John Scheel as Vice-

President of Warren Steel.

20.     Upon request for additional information concerning the debt-restructuring, Hornbeam

ultimately received 20 documents, including 19 agreements of approximately 250 pages.

21.     The EGM was postponed multiple times at Hornbeam's request as there was insufficient

information to make an informed decision concerning the "proposed" restructuring. Hornbeam

later received a limited disclosure of financial documentation related to Warren Steel's financials

on August 27, 2014, which FTI Consulting LLP ("**FTI**"), a financial forensic and litigation

consultant, determined was incomplete and appeared to contain significant anomalies.

22.     To prevent the approval of this oppressive, unfairly discriminatory, and unfairly

prejudicial debt-restructuring agreement, Hornbeam sought an interim injunction in the BVI to

prevent the approval of the debt-restructuring. The interim ex parte injunction was granted by the court.

23.     Despite Halliwel's agreement to postpone the EGM on multiple occasions in August, and multiple communications made by Symeou and/or Halliwel related to the EGM, it was not until September 2014, while the injunction application was being litigated, that Hornbeam, to its own consternation, was informed by the Defendants/Respondents of the injunction that the resolutions related to the debt-restructuring agreement, which were to be submitted for approval at the EGM of Halliwel originally noticed for August 8, 2014, had *already* been "passed" by the Unanimous Written Consent of the Sole Member of Warren Steel on August 1, 2014. The Unanimous Written Consent of the Sole Member of Warren Steel is attached hereto as **Exhibit 3**.

24.     Clearly, this action was taken without the knowledge and consent of Hornbeam and/or Shulman and without any EGM of Halliwel taking place, despite the notice.

25.     Most disturbingly, under the terms of the proposed debt-restructuring agreement, the new and ratified loans to Warren Steel were styled "on demand" and could be called in at any time at the sole discretion of the lenders, which appear to be controlled by the Other Ultimate Beneficial Owners and/or Korf.

26.     The actions of Kolomoisky, Bogolubov and/or Korf, and the entities controlled by them have minimized, if not eliminated, the ability of Shulman to get a return on his initial investment. The value of the shares have significantly decreased by the heavy burden of the restructured debt of Warren Steel and especially by granting a priority secured interest to the new loans in the amount of $25 million in favor of Optima Acquisitions, LLC (**"Optima Acquisitions"**), which is controlled by Kolomoisky. Email correspondence is attached hereto as **Exhibit 4**.

7

27.     While this depreciates all share value, the interests of the Other Ultimate Beneficial Owners are still protected by their security interests and their ownership of the lenders. But Hornbeam has no such protection and is purely the victim of the self-serving debt-restructuring and the related-party loans.

## BACKGROUND CONCERNING THE PRINCIPALS' INITIAL INVESTMENT IN WARREN STEEL AND THE UKRAINIAN BUSINESS ENVIRONMENT

28.     Since around 1999, the Principals have entered into various transactions and held business interests together. As I understand and has been stated to me, the Principals were friends.

29.     Based on my investigation and my review of the sworn affidavits made by Shulman to the BVI court (the **"Shulman Declarations"**) attached hereto as **Exhibit 5**, I believe Bogolubov always follows the direction of Kolomoisky in business decisions.

30.     In 2001, Shulman discovered an investment opportunity in a steel factory in Warren, Ohio.

31.     Shulman shared this opportunity with Kolomoisky and Bogolubov and they were interested in participating. After discussions, the three entered into a joint venture (**"Joint Venture"**) to purchase a steel manufacturing facility, the equipment, and the real property (the **"Steel Factory"**).

32.     I understand that from the inception of the Joint Venture, the Principals agreed to have an equal participation and beneficial interest in the Steel Factory and the company that would become Warren Steel (**"Joint Venture Agreement"**). Although the Joint Venture Agreement was not fully formalized in writing, it was binding on the Principals.

33.     I understand that agreements that are not fully formalized in writing but nevertheless binding are typical and commonplace in the Ukrainian business environment and among the

Principals as well.  I understand that the Principals had previously and subsequently entered into similar ventures pursuant to such agreements, some of which were very profitable.

34.     However, Shulman made the initial investment of $13.5 million for the Steel Factory through Shulman's entity Instrad Limited ("**Instrad**"), and he further advanced roughly $15 million after the initial investment in support of the Steel Factory.

35.     It was agreed that Kolomoisky and Bogolubov would compensate Shulman for his initial roughly $28.5 million investment, but based on my investigation, this never occurred.

36.     In 2001, the Principals formed Warren Steel, a company incorporated under the laws of Delaware, as a potential entity to own the Steel Factory.

37.     After being transferred from Instrad to Plama Limited and then back to the Principals, the Steel Factory was finally assigned on November 26, 2007 to Warren Steel. The Trust Termination Agreement is attached hereto as **Exhibit 6**.

38.     On January 5, 2006, Halliwel, a BVI Company, was formed.

39.     In 2008, one hundred percent of Warren Steel's membership interests were transferred by the Principals to Halliwel.

40.     Halliwel's sole asset is 100 percent of the shares in Warren Steel.

41.     Halliwel's shares are ultimately beneficially owned by the Principals, one-third each.

42.     However, Halliwel has three nominee shareholders, each with a one-third interest: (i) Hornbeam; (ii) Marigold, of which Bogolubov is the ultimate beneficial owner; and (iii) Symeou, as trustee for Kolomoisky.

43.     The Applicant herein, Hornbeam, owns one-third of the total outstanding shares of Halliwel.  Hornbeam holds these shares as nominee for Bracha Foundation ("**Bracha**").

Shulman is the settlor and first beneficiary of Bracha. Accordingly, Shulman is the ultimate beneficial owner of one-third of Halliwel.

44.     As such, Shulman and the Other Ultimate Beneficial Owners control Halliwel.

45.     Halliwel's sole director is Symeou and its secretary is Christou Thanos.

## THE JOINT VENTURE

46.     It is my understanding that from the beginning, the Principals agreed in the Joint Venture Agreement to have an equal participation and beneficial interest in the steel plant and the company that would become Warren Steel. In 2006, they entered into two financial agreements with a credit line of $90 million in favor of Warren Steel with $30 million attributable to each ("**Investment Agreement**"). Unanimous Written Consent in Lieu of Meeting and Divot Loan Agreements are attached hereto as **Exhibit 7**. Afterwards, this debt in Warren Steel was restructured to equity in Halliwel with one-third attributable to each.

47.     It is my understanding that the Principals agreed in the Joint Venture Agreement that loans and investments would be equally contributed and in the event of an approved loan or investment made by one of the Principals, the understanding was that the other two would contribute equally. This did not mean that they would each equally invest in each individual investment or loan. Rather, it was the overall idea that the Principals would act for the benefit of the Joint Venture and contribute and share in the aggregate of all investments, all profits, and all losses to which the three agreed. It is my understanding that it was contemplated that at some point, the Principals would reconcile all *agreed* investments and loans.

## SHULMAN'S PURCHASE OF THE STEEL PLANT AND FORMATION OF WARREN STEEL

48.     As noted above, in 2001, Shulman became aware of an investment opportunity concerning a steel company called CSC, Ltd. ("CSC"). CSC operated a steel factory in Ohio

before it had filed for bankruptcy earlier that year. Shulman was originally interested in acquiring CSC's steel factory, breaking the plant down, and transporting it to Ukraine where it would be reconstructed and thereafter carry on the steel-making business.

49.     In furtherance of this goal, Shulman used his capital and purchased CSC's assets in 2001 for $13.5 million through one of his companies, Instrad. Kolomoisky and Bogolubov agreed that they would also invest in the venture.

50.     Warren Steel was incorporated for the purpose of owning the steel factory. Warren Steel's formation documentation is attached hereto as **Exhibit 8**.

51.     According to Warren Steel's formation documents and a members' resolution dated November 19, 2001, Shulman was appointed as President and Bogolubov was appointed as Treasurer and Secretary.

52.     On November 19, 2001 Shulman, Kolomoisky, and Bogolubov executed a Unanimous Written Consent of Members in Lieu of a Meeting that passed multiple resolutions. The Unanimous Written Consent is attached hereto as **Exhibit 9**. Although the Joint Venture was not fully formalized in writing, this Unanimous Written Consent partially evidences the Principals' understanding regarding the Warren Steel related Joint Venture.

53.     Contrary to Shulman's original plan, the steel factory was not broken down.

54.     After his initial investment, Shulman or entities under his control made additional investments to U.S.-located Warren Steel for costs, maintenance, and upkeep.

### THE FORMATION OF HALLIWEL AND THE INVESTMENT AGREEMENT

55.     Around 2006, pursuant to the Joint Venture Agreement, the Principals re-confirmed the Joint Venture and determined to take action to begin operations of the Steel Factory instead of dismantling and relocating the Steel Factory to Ukraine.

11

56.     As part of the Joint Venture, they subsequently jointly decided to alter the original objective of dismantling and relocating the Steel Factory to the new objective of restarting operations in Warren, Ohio. It was obvious at this time that the new objective would require additional investment. As such, they had jointly agreed upon the Investment Agreement consisting of an investment of $30 million each.

57.     The Investment Agreement was formed during a series of discussions as has been the common practice between these men. It was memorialized in further documentation.

58.     Halliwel, the current Sole Member of Warren Steel, was incorporated on January 5, 2006 as a BVI business company pursuant to the BVI Business Companies Act, 2004. Halliwel's formation documentation is attached hereto as **Exhibit 10**.

59.     On January 18, 2006, Symeou was appointed Halliwel's sole Director and Christou Thanos its Secretary.

60.     Halliwel's register of members of Halliwel shows that, in 2006, Symeou held all the issued shares in trust for Shulman and the other Ultimate Beneficial Owners, 1/3 each, which remained the case until 3 April 2009. Halliwel's Register of Members is attached hereto as **Exhibit 11**.

61.     I understand that Halliwel's shares are still ultimately owned by Shulman and the Other Ultimate Beneficial Owners, 1/3 each. It appears that Halliwel continues to have only the three registered shareholders, each with a one-third interest: Hornbeam, of which Shulman is the ultimate beneficial owner; Marigold, of which Bogolubov is the ultimate beneficial owner; and Symeou, as trustee for Kolomoisky.

62.     On April 3, 2008, the Principals, as shareholders of Warren Steel, agreed that they would appoint Halliwel as the sole member of Warren Steel and they would resign as members. Halliwel's new membership documentation is attached hereto as **Exhibit 12**.

63.     From April 2008, 100% of Warren Steel has been held by Halliwel.

64.     As such, Halliwel became the sole member of Warren Steel. Bogolubov resigned as Warren Steel's secretary and Mr. Neophistos Savvides ("**Savvides**") was appointed as his replacement. Savvides' appointment documentation is attached hereto as **Exhibit 13**.

65.     Through their one-third shares in Halliwel, the Principals each continued to have one-third control over Warren Steel.

66.     After the incorporation of Halliwel until recently, Shulman did not take an active role in the management of Warren Steel. Instead, in the last few years his advisor, Mr. Ronny Pifko ("**Pifko**"), has managed Shulman's interest in Warren Steel. I understand that Pifko liaised, on Shulman's behalf, with Kolomoisky's advisor, Mr. Timur Novikov ("**Novikov**").

67.     I understand that the Joint Venture Agreement obligated the Other Ultimate Beneficial Owners to consult and obtain approval from Shulman before any major decisions were made concerning Warren Steel. Hence, I understand that Halliwel would not approve any major decisions as shareholder of Warren Steel unless the Principals had jointly approved the decisions through their shareholdings in Halliwel.

68.     On 5 April 2008, Halliwel (as sole member of Warren Steel) adopted the Limited Liability Company Operating Agreement of Warren Steel, which allowed certain conflicts of interest that were not previously permitted. The Operating Agreement is attached hereto as **Exhibit 14**. Section 13(E)(4) states that the President may not take certain actions without the approval of the members which may be provided by a majority vote at a meeting of members or

through informal action of the members <u>without a meeting</u>. These actions include *"(iii) incur or refinance any indebtedness for money borrowed by the Company in an amount exceeding $100,000, (iv) make any single expenditure or series of related expenditures on behalf of the Company in an amount exceeding $100,000 other than expenditures required to purchase raw materials or inventory in the ordinary course of business or expenditures contemplated by the Company's annual budget or business plan, if any."* Pursuant to section 16, the books and records of Warren Steel shall be available at reasonable times for inspection and copying by the Members or their duly authorized representative. Warren Steel is also obliged to furnish to its members, annual financial statements, including at least a balance sheet as of the end of the fiscal year and a statement of income and expenses for the fiscal year.

69.     On 3 April 2009, a third of the shares of Halliwel were transferred from Symeou to Marigold, a Jersey company. The affidavits filed in the BVI Liquidation Proceeding note that Bogolubov is Marigold's ultimate beneficial owner. Copies of the Symeou and Korf affidavits are attached hereto as **Exhibit 15** and **Exhibit 16** respectively.

70.     As discussed, Shulman's shares in Halliwel were originally held in trust for him by Symeou. However, on 10 October 2012, the 33,332 shares with serial numbers 0001 to 33,332 previously held by Symeou were transferred to Hornbeam to secure his control over one third of the shares of Halliwel. The Register of Members and Instrument and Certificate of Transfer is attached hereto as **Exhibit 17.**

71.     It is my understanding that currently Marigold, Hornbeam, and Symeou each hold 33,332 shares in Halliwel.

## FURTHER INVESTMENT INTO WARREN STEEL: THREE EQUAL INVESTMENTS

72.     As stated above, some of the joint ventures between Shulman, Kolomoisky and

Bogolubov were profitable, and, at times, the three often reinvested profits into the next joint

venture(s).

73.     For example, around 2009, Mr. Shulman attended a meeting at Kolomoisky's office in

Dnepropetrovsk, Ukraine to discuss how the profits from a previous transaction between the

three would be allocated.  Kolomoisky, Shulman's finance director, Boris Veksler, and Shulman

attended the meeting.

74.     It is my understanding that Kolomoisky told Shulman that Kolomoisky allocated $30

million into Warren Steel from Shulman's share of the expected future profit from the separate

Abramovich joint venture .  It is my further understanding that Shulman's share of the

Abramovich joint venture later materialized in excess of $30 million.

75.     Kolomoisky had paid the $30 million as an additional investment on Shulman's behalf

into Warren Steel.  Shulman understood that the $30 million was invested in the U.S. into

Warren Steel directly or via Kolomoisky controlled entities.  I understand that Kolomoisky told

Shulman that this investment had already been made at the time Kolomoisky notified Shulman of

the investment.  At that time, Shulman was not aware of the status of Warren Steel and did not

question Kolomoisky further.

## CAPITALIZATION OF SHAREHOLDER LOANS INTO EQUITY IN HALLIWEL

76.     In June 2012, Halliwel recapitalized what appears to be ongoing shareholder loans into

new equity, and new shares were issued.  Even pursuant to this restructuring, Shulman

understands the 1/3 partnership arrangement was respected with Shulman retaining a 1/3 share.

Please see **Exhibit 1**. The precise mechanisms by which the shareholder loans were injected into

Warren Steel is a subject of investigation in particular, whether it was done from funds owed to Shulman from other joint venture(s).

77.     Shareholders' Resolutions for Halliwel, dated 12 June 2012, state, that *"the Company's Board advised the Shareholders that it considered convenient for the Company's business to capitalize shareholders loans in the total sum of USD $ 86,679,998.05 outstanding by the Company, of which USD $28,894,488.51 is owed to Marigold Trust Company Limited and USD 57,785,509.54 is owed to Mr Panikos Symeou."* It was resolved that Halliwel should issue an additional 49,996 ordinary shares which would be allotted with a premium such that the total consideration to be paid by Marigold and Symeou for the additional shares equated to the amounts which were due to Marigold and Symeou pursuant to the assigned Financing Agreements. The Shareholder Resolutions are attached hereto as **Exhibit 18.**

78.     On 13 June 2012, Symeou and Marigold entered into Set-Off Agreements ("**Set-Off Agreements**") with Halliwel to acknowledge the set off described herein. The Set-Off Agreements are attached hereto as **Exhibit 19.**

### THE MALFEASANCE INVESTIGATION

79.     This practice continued until recently. To Shulman's dismay, despite the agreement to act jointly and share equally, Shulman has uncovered disturbing documentation that appears to show that the Other Ultimate Beneficial Owners, through entities acting in the United States as their agents or otherwise under their control have been self-dealing and operating Warren Steel for the Other Ultimate Beneficial Owners' benefit and to the detriment of Shulman, Hornbeam, Halliwel, and Warren Steel.

80.     In 2012 after sensing these questionable activities, Shulman asked me to look into this matter. For the past two and a half years I have investigated and requested information and

documents, mainly from Timur Novikov, Kolomoisky's lawyer, and Halliwel's sole director,

Symeou, in an attempt to determine the status of Shulman's investment in Warren Steel. Please

see **Exhibit 1**.

81.     The purpose of my investigation was to ensure that Shulman's interest was not

jeopardized by the Set-off Agreements, whereby the Principals' debt interests in Warren Steel

were converted into equity interests in Halliwel.

82.     At this point in time, I did not have an understanding of the financial situation of Warren

Steel, including the extent of the related-party loans and Warren Steel's massive operating losses.

83.     My investigation was repeatedly met with resistance, circuitous explanations, vague

responses, incomplete disclosures, and partial explanations.

84.     Relatively few documents were provided and they were not sufficient to allow a

valuation of Shulman's shares to be undertaken.

85.     Only this year was I provided with enough information and documentation to begin to

understand the wider picture, to ascertain Warren Steel's massive and still unexplained operating

losses and debts, and to question the legitimacy of the loans that appear to have been made to

Warren Steel by various entities controlled by Kolomoisky and Warren Steel's President, Korf.

86.     In June and July 2012, Pifko and I engaged in correspondence with Novikov seeking

information and documentation following the issuing of the new shares in Halliwel and the

capitalization of loans in June 2012 as set out above.  Copies of the June and July

correspondence are attached hereto as **Exhibit 20**.

87.     In November and December 2012, there was correspondence between Pifko and Novikov

when Pifko was seeking to ascertain the amount of investment made by the Principals.  Copies of

the November and December correspondence are attached hereto as **Exhibit 21**.

88.     I understand from Pifko that the first indication he had that Warren Steel had been taking

out significant loans from related companies was in late November 2012 when he received

correspondence from Novikov containing a document entitled "Warren Steel Holdings, LLC.

Intercompany Loans For the Period 01/01/10-09/28/12." A copy of the attachment is attached

hereto as **Exhibit 22**.

**"RELATED PARTY LOANS" TO WARREN STEEL**

89.     There have been a significant number of loans made to Warren Steel as more fully set

forth in the following documents, which I have analyzed and reviewed:

   a.   The balance sheet for Warren Steel as of 31 August 2013 which was sent on 15

        November 2013 to Shulman's Liechtenstein advisor, Dr. Verena Ernst (**"Dr. Ernst"**),

        from Symeou details loans under long term liabilities in the amount of

        $56,290,895.90. The Balance Sheet is attached hereto as **Exhibit 23**.

   b.   Exhibit A of the Restructuring Documents (as defined below) received by Dr. Ernst

        from Symeou on 4 August 2014, details loans due in the amount of $62,160,895.90.

        Exhibit A of the Restructuring Documents is attached hereto as **Exhibit 24**.

   c.   Copies of the loan agreements, each of which have been signed for both lender and

        borrower by Korf, with their corresponding promissory notes which were sent to Dr.

        Ernst by Symeou in November 2013 that amount to approximately $34 million.

        Copies of the loan agreements are attached hereto as **Exhibit 25**.

   d.   The table detailing the Intercompany Loans for the period 1 January 2010 to 28

        September 2012 sent by Novikov to Pifko where the loans which are detailed in the

        table were granted in the amount $18,875,530.48. It should be noted that the first

        loan agreement of which we were provided a copy dates back to 2008. I do not know

why loans made prior to 1 January 2010 were excluded from the information provided by Novikov.

90.    Many of the loans made to Warren Steel were made by entities nominally owned or controlled by Mordechai Korf ("**Related Party Lenders**").  I further understand that Kolomoisky and possibly Bogolubov have significant interests in and are otherwise the ultimate beneficial owners of these Related Party Lenders.

91.    As stated by Korf in his letter dated 7 August 2014 and in the BVI Liquidation Proceeding, the following "connected parties," have made loans in at least the following amounts:

    a.  5251 36th Street LLC has loaned Warren Steel $130,000.00;

    b.  CC Metal and Alloys LLC has loaned Warren Steel $2,500,000.00;

    c.  Felman Trading, Inc. has loaned Warren Steel $21,275,000.00;

    d.  Mordechai Korf has loaned Warren Steel $9,930,365.42;

    e.  Optima Acquisitions, LLC has loaned Warren Steel $8,370,530.48;

    f.  Optima Fixed Income LLC has loaned Warren Steel $3,820,000.00;

    g.  Optima Group LLC has loaned Warren Steel $5,630,000.00;

    h.  Optima International of Miami, Inc. has loaned Warren Steel $500,000.00;

    i.  Optima Ventures, LLC has loaned Warren Steel $1,505,000.00; and

    j.  Querella Holdings Limited has loaned Warren Steel $8,500,000.00.

### THE EXTRAORDINARY GENERAL MEETING
### AND THE PROPOSED DEBT RESTRUCTURING AGREEMENT

92.    On 1 August 2014, Dr. Ernst, Shulman's Liechtenstein advisor, received an email from Symeou attaching a notice of an "extraordinary" shareholders meeting by which the debts and liabilities of Warren Steel were to be "restructured."

93.    This notice was followed on 4 August 2014 with further documentation; but, it was later uncovered that most of the key documents had already been executed by this time. The restructuring agreement consisted of the following twenty documents (the "**Restructuring Documents**"):

    a.  Draft written consent of sole member of Warren Steel (debt restructuring);

    b.  Exhibit A Loan Agreements;

    c.  Exhibit B Accounts Payable;

    d.  Draft Written Consent of Sole Member of Warren Steel (election of vice-president);

    e.  Exhibit C Security Agreement;

    f.  Exhibit D Mortgage;

    g.  Exhibit E Agency Agreement;

    h.  Exhibit F Intercreditor Agreement;

    i.  Exhibit G Tube City IMS LLC ("TCIMS") Loan Agreement;

    j.  Exhibit H TCIMS Promissory Note;

    k.  Exhibit I TCIMS Security Agreement;

    l.  Exhibit J TCIMS Mortgage;

    m.  Exhibit K Perfection Agreement;

    n.  Exhibit L Scrap Agreement;

    o.  Exhibit M Demolition Agreement;

    p.  Exhibit N Scrap Metal Services LLC Promissory Note;

    q.  Exhibit O Scrap Agreement;

    r.  Exhibit P New Lender Loan Agreements and Promissory Notes;

    s.  Exhibit Q New Lender Security Agreements; and

    t.  Exhibit R New Lender Mortgages.

The Restructuring Documents are attached hereto as **Exhibit 26**.

94.     On 7 August 2014, Korf sent a letter to Hornbeam addressed to "fellow shareholder." I am not aware that Korf is a shareholder of Warren Steel or Halliwel. A copy of the letter is attached as **Exhibit 27**.

95.     Many of the Restructuring Documents identify a "New Lender." The identity of the "New Lender," Optima Acquisitions, LLC, was not revealed to Dr. Ernst until 20 August 2014. The "New Lender" Optima Acquisitions, LLC, according to Korf, is a related party lender. A copy of the August 20, 2014 correspondence is attached hereto as **Exhibit 28**. I understand that Kolomoisky is the ultimate beneficial owner of Optima Acquisitions LLC.

96.     According to the Restructuring Documents: Warren Steel's assets were worth only $27 million. The restructuring agreement proposed adding another $25 million in related party loans secured by Warren Steel's assets. The related party loans were even given priority preference over the non-related party loans.

97.     If the assets of Warren Steel are valued at only $27 million, it appears that Optima Acquisitions (and therefore Kolomoisky alone or together with Bogolubov) will have the benefit of security over all of the assets of Warren Steel which, if enforced, would leave approximately $2 million for the other lenders and obviously nothing for Hornbeam/Shulman.

98.     Despite having asked for financial information on 30 July 2014, the financial statements were not provided to Dr. Ernst until 27 August 2014. A copy of the July 30, 2014 request and the August 27, 2014 production are attached hereto as **Exhibit 29** and **Exhibit 30** respectively.

99.     The Extraordinary General Meeting ("EGM") was scheduled to take place on 8 August 2014.

100.     On 7 August 2014, the EGM was postponed to 14 August 2014. On 11 August 2014, the EGM was postponed again until 21 August 2014. On 19 August 2014, Hornbeam requested a

21

further postponement of the EGM.  On 20 August 2014, Hornbeam received a new notice for the

meeting to be held 1 September 2014.  A copy of the postponement correspondence is attached

hereto as **Exhibit 31**.

101.    On 26 August 2014, Hornbeam requested a further adjournment but a member of

Symeou's law firm, Mrs. Artemis Mildoni denied the adjournment by an email on 27 August

2014 despite Halliwel having sent Shulman somewhere between 4,600 and 27,000 pages

(depending on how it is displayed) of financial information that morning.  A copy of this

correspondence is attached hereto as **Exhibit 32**.

**THE UNILATERAL AND CLANDESTINE APPROVAL OF THE
DEBT-RESTRUCTURING AGREEMENT**

102.    Notwithstanding all the above-described communications regarding the EGM, Symeou

and Korf each provided affidavits in the BVI Action stating that they approved the restructuring

documents on 1 August 2014.  For copies of the Symeou and Korf affidavits, please refer to

**Exhibit 15** and **Exhibit 16** respectively.

103.    Specifically, Symeou passed a resolution, in his capacity as sole director of Halliwel,

approving the proposed restructuring on 1 August 2014.  A copy of the 1 August 2014 resolution

is attached hereto as **Exhibit 33**.

104.    Of course, this was the SAME DAY that Symeou first gave notice to Hornbeam of the

EGM, originally scheduled for August 8, 2014, where "consideration" of this very action was to

take place.  Compare Exhibit 28 with Exhibit 15 ¶ 8 and Exhibit 16 ¶ 6.  Also on August 1, 2014,

Korf, as Warren Steel's president, began to approve the debt restructuring agreement.

105.    Kolomoisky and Bogolubov have ignored the Joint Venture Agreement and have

proceeded to make decisions in relation to Warren Steel without consulting Shulman in any way

22

to the detriment of Shulman and Hornbeam. In the alternative, Symeou and Korf could be the beneficiaries of self-dealing.

106. In either event, more information and documentation is necessary for use in the Actions.

### THE FTI CONSULTING REPORT: WARREN STEEL'S RECORDS ARE "INCOMPLETE" AND RIFE WITH "SIGNIFICANT ANOMALIES," "INCONSISTENCIES," AND "RELATED PARTY" TRANSACTIONS

107. FTI, a forensic consultant that reviewed the information Halliwel provided to Hornbeam, makes clear that Warren Steel's records are incomplete.

108. Even worse, the records that were provided are rife with significant anomalies, inconsistencies, and "related party" transactions.

109. In September 2014, I coordinated with Hornbeam's BVI counsel, Walkers, to engage the managing director in the forensic and litigation consulting segment of the well-regarded forensic accounting firm FTI to analyze and prepare a report ("**the FTI Report**") regarding Hornbeam's financial position, its solvency, and the commercial merits of the proposed restructuring of Hornbeam's debts. The FTI Report and Appendices are attached hereto as **Exhibit 34** and **Exhibit 35** respectively.

110. The FTI Report concluded, among other things, that the information that was provided to it was "incomplete, and appears to contain significant anomalies." *See* Exhibit 34 at p. 5.

111. FTI and Hornbeam were only provided electronic records prepared by Warren Steel, not the underlying, independent records evidencing business and financial transactions such as bank statements, invoices, purchase and sale orders, and wire transfer advices - records of the type normally relied upon by independent auditors to determine the true health and financial condition of a company.

112.   The FTI Report's Executive Summary, *see* Exhibit 34 at p. 5, concluded, among other things, that:

   a.   There was "indications that Warren Steel may be insolvent on a balance sheet basis."

   b.   "The only significant cash generation we have identified is that from related party funded loans."

   c.   There were also "concerns in respect to Warren Steel's financial position on a cash flow bases."

   d.   There was "insufficient information to comment on the commercial merits of the proposed restructuring."

113.   Notwithstanding the lack of sufficient information, the FTI Report's General Observations, *see* Exhibit 34 at pp. 6 - 8, concluded, among other things, that:

   a.   FTI was "surprised that a company of the size of Warren Steel is using an accounting package [QuickBooks] that is typically used by smaller concerns."

   b.   "It appears that there are a number of inconsistencies between the financial statements and the electronic accounting records, including missing data . . . ."

   c.   They were not provided records after 30 December 2013.

   d.   Many accounting entries were condensed, which means that FTI was unable to determine the nature of the individual transactions.

   e.   "There are numerous other journal entries which do not identify the transacting party."

   f.   FTI "identified certain trading partners which appear to be (or previously have been) related to the Optima Group."

   g.   There are discrepancies between gross sales and net sales.

24

    h.  Entries refer to undefined terms such as "blank," "fishbowl," and "23."

    i.  "Further, there are a large number of debit entries within sales overall, which is unusual."

    j.  "The cost of goods sold ("COGS") figure is generally about the same as the sales figure, and sometimes higher.  However, for the business to be profitable it would need to be lower."

    k.  "I believe that in or around 2012 the Company changed the way it allocated costs between production costs (COGS) and general administrative expenses (Expenses)."

    l.  "We have identified a large number of round sum payments to suppliers . . . ."

    m.  "Further, we have identified negative balances on inventory accounts, which appear unusual (asset accounts would normally show a positive balance)."

114.    It is clear from the FTI Report that, at best, Halliwel failed to provide Hornbeam with sufficient information regarding the debt restructuring agreement or even Warren Steel's financial position generally.

115.    It is equally clear, despite the limited information provided, that Warren Steel engages in multiple transactions with entities that are owned or controlled by the Other Ultimate Beneficial Owners and/or Korf and/or Symeou.

### HALLIWEL, MARIGOLD, AND SYMEOU CONCEALED MAJOR CORPORATE ACTION FROM HORNBEAM PRIOR TO AND DURING HORNBEAM'S EMERGENCY BVI LITIGATION

116.    When Hornbeam began to realize the magnitude of the deception and self-dealing, it immediately moved the BVI Court for an injunction (similar to a U.S. temporary restraining order) for the purpose of enjoining the proposed restructuring.  It also sought to appoint a neutral, provisional liquidator over Halliwel.

117.    The main purpose of this action was to stop the debt restructuring from being approved while a provisional liquidator was being appointed to maintain the status quo and protect the assets of Halliwel, namely Warren Steel.

118.    This was all done based on Halliwel and Symeou's representations that the debt restructuring agreement would be submitted for approval at the EGM and that the meeting was scheduled, or rescheduled, for some future date.

119.    Hornbeam spent considerable resources to bring BVI counsel, Walkers, up-to-speed to be able to file the necessary paperwork before the meeting was to take place.

120.    However, in response to Hornbeam's application for an injunction, Korf and Symeou both submitted affidavits stating that the debt restructuring agreement had already been approved on August 1, 2014.

121.    As such, the BVI court discharged the injunction because the action which had been restrained had already taken place.  The BVI Court also declined to appoint a provisional liquidator on an emergency basis.  The BVI Liquidation Proceeding was withdrawn by consent between the parties.  However, Hornbeam may issue a further Originating Application.

## THE DISPUTE BETWEEN KOLOMOISKY AND SHULMAN

122.    It is my understanding that Shulman has been doing business with Kolomoisky and Bogolubov since around 1999 and previously considered them all to be friends and trustworthy.

123.    It is my understanding that Shulman's friendship with Kolomoisky became strained as a result of a business deal with Abramovich which materialized in the end of 2007.  In the course of this transaction Abramovich accused Kolomoisky of improperly retaining certain assets as part of a transaction.  Shulman believed and made known to Kolomoisky that Kolomoisky was in the wrong.

26

124.    I understand that $30 million from Shulman's share of the profit from this deal has been invested by Kolomoisky on Shulman's behalf in Warren Steel.

125.    Kolomoisky is a businessman, but it is necessary to understand something about the general business environment in Ukraine.  It is widely recognized that corruption and bribery are common features of business and political activities in Ukraine.

126.    When dealing with Kolomoisky and Bogolubov, there is a clear pattern of questionable business activities.  An example of ongoing proceedings is the case commenced by Mr. Victor Pinchuk (**"Pinchuk"**) against, amongst others, Kolomoisky and Bogolubov for approximately £2 billion. This related to an iron ore mining business in Ukraine which was the subject of a joint venture involving a pooling of the ferroalloy assets owned by Pinchuk, Kolomoisky, and Bogolubov to be vested in a holding company (**"Ferroalloy Holding"**) on terms that Kolomoisky and Bogolubov would have a 50% share therein, Pinchuk a 30% share, and a third party a 20% share on the basis that the profits of the Ferroalloy Holding would be distributed between the shareholders in the same proportions as their shareholdings. The dispute arose out of Pinchuk's claim that he had not been paid his share of the profits of the Ferroalloy Holding and that Kolomoisky and Bogolubov had depressed the profits of the Ferroalloy Holding by siphoning off assets through related party transactions.  Complaint to Pinchuk case is attached hereto as **Exhibit 36.** A scheme which appears to be similar to what Shulman believes is happening with Warren Steel.

127.    In addition to the information alleged in the Pinchuk actions, there is a vast amount of information available on the Internet about Kolomoisky, Bogolubov, and their questionable business activities, much of which appears to be related to U.S. transactions or U.S.-located companies.  Copies of recent news articles are attached hereto as **Exhibit 37.**

## THE CONTEMPLATED LITIGATION

128.    In the very near future, with the aid of the discovery sought herein, it is reasonably contemplated to bring the Actions as described above, in various jurisdictions including but not limited to the British Virgin Islands

129.    In the Actions, Shulman, Hornbeam, and/or Tectum are, and will be, seeking the following remedies:

  (i) a declaration of shareholder oppression and an associated accounting, valuation, liquidation and/or buyout with respect to Hornbeam's Halliwel shares; and/or

  (ii) damages for Symeou's breach of contract, fiduciary duties, and other duties associated with his positions, as well as for other extra-contractual liabilities; and/or

  (iii) damages for Kolomoisky's and/or Bogolubov's breach of contract, fiduciary duties, and other duties, as well as for other extra-contractual liabilities in a separate partnership and joint venture by wrongfully retaining or diverting Shulman's profits from the same.

130.    Because Warren Steel is the sole asset of Halliwel, the evidence most relevant to the Actions will be the business records of Warren Steel, the persons in the United States operating and managing Warren Steel, and the independent records pertaining to Warren Steel held by Warren Steel's counterparties, vendors, financial institutions, lawyers, accountants, and lenders.

131.    In particular, the Actions and accordingly, this evidence-gathering exercise, will focus on (i) all related-party loans, (ii) transactions between Warren Steel and "related trading partners," (iii) significant discrepancies in Warren Steel's internal accounting records, some of which have been obtained by the Applicant, (iv) the status of Shulman's initial roughly $28.5 million investment in Warren Steel, and (v) Kolomoisky's purported $30 million investment in Warren Steel on behalf of Shulman.

28

132.    Hornbeam and Shulman discovered that Halliwel's Other Ultimate Beneficial Owner(s) and/or its sole director, Symeou, acted in concert with Warren Steel's president, Korf, without Shulman and Hornbeam's prior knowledge or consent, to approve multiple "related party loans" resulting in a debt restructuring agreement that gave lenders related to and/or controlled by the Other Ultimate Beneficial Owner(s) a priority security interest in Warren Steel's assets and revenues.

133.    As described above, via the collusion of the Other Ultimate Beneficial Shareholder(s), Halliwel approved the debt restructuring agreement in a deceptive fashion by first asking for Hornbeam's approval for the restructuring via a special shareholder meeting that in the end never took place, but then doing so unilaterally without Hornbeam's or Shulman's consent, knowledge, or approval.

134.    This debt-restructuring agreement was supposedly necessary because Warren Steel has had massive operating losses, including electricity costs, and has been accepting tens of millions of dollars in loans from both related and non-related parties, resulting in what appears to be a balance sheet insolvency.  The promissory notes given to the unrelated parties indicate that they hold a position inferior to that held by Optima Acquisition for the additional $25 million loan approved by the debt-restructuring agreement.

135.    As will become evident in the Actions and via the discovery sought herein, the reasons for Warren Steel's consistent operating losses and continuous funding via related party loans go to the heart of the multi-layered dispute.

136.    For instance, except for the Divot loans, all of the "related party loans" which I have seen were signed by Korf on behalf of **both** the lender(s) and borrower Warren Steel.  Copies of Loan Agreements are attached hereto as **Exhibit 38**. This is because Korf is either the President or an

29

officer or maintains a similar position of authority at the various Related Party Lenders, as more fully set forth below. Clear evidence of Korf's relation to the multiple lenders is evidenced by the 14 August 2014 Agency Agreement where Korf signs on behalf of himself and ten other entities as CEO, president, manager, or power-of-attorney in the same document. The Agency Agreement is attached hereto as **Exhibit 39**.

137.    I believe and understand that the ultimate beneficial owner(s) of the Related Party Lenders is/are none other than the Other Ultimate Beneficial Owner(s) of Halliwel. As such, it appears the restructuring and security interest is ultimately being directed and arranged for the benefit of the Other Ultimate Beneficial Owner(s) of Halliwel without Hornbeam's consent and to Hornbeam's detriment.

138.    In addition to the loans, many of the business transactions in which Warren Steel appears to engage are with entities "related" to Korf and/or the Other Ultimate Beneficial Owner(s). In particular, and as set forth in the preliminary forensic analysis report produced by FTI, there are significant discrepancies in terms of Warren Steel's books and ledgers, ranging from unbalanced debits and credits, to suspicious round-number payments to "related" counterparties including Mr. Korf personally, and most importantly, a potential undervalue transfer scheme (selling goods to related parties for less than their true value to transfer funds). The FTI Report and Appendices are attached hereto as **Exhibits 34** and **Exhibit 35** respectively.

139.    On their face these activities suggest profits which would have been earned by Warren Steel were wrongfully diverted to other companies controlled by Korf and/or the Other Ultimate Beneficial Owner(s) to the detriment of Warren Steel, Halliwel, as sole owner of Warren Steel, and Shulman.

30

140.    Under the circumstances, the following categories of evidence will be relevant, important and useful to Hornbeam's claims in the Actions, all of which evidence is located in the United States (in terms of both documents and witnesses):

(i) the valuation of Warren Steel, including its revenues, expenses, production capabilities, liabilities, and assets;

(ii) the circumstances surrounding the loans made by the Related Party Lenders;

(iii) the source of any funds utilized to make these loans;

(iv) the use (or misuse) of any such funds by Warren Steel and its management;

(v) the precise nature and specifics of the transactions in which Warren Steel is engaged, including but not limited to any transactions with entities "related" to Korf and the Other Ultimate Beneficial Owners of Warren Steel;

(vi) the current claims held by Warren Steel against third parties, including but not limited to claims Warren Steel may hold against fraudulent transferees and Warren Steel's management arising from, *inter alia*, self-dealing and breach of fiduciary duty; and

(vii) the circumstances by which Kolomoisky invested in Warren Steel on behalf of Shulman including the source of funds which include funds due to Shulman from Kolomoisky from previous business transactions.

## NEED FOR DISCOVERY IN THIS DISTRICT

141.    As discussed above, the primary information relevant to the Actions is substantially located in this District. This includes documentation from Warren Steel's lenders, counterparties and vendors. As noted above, none of this information has been made available to Shulman, Hornbeam, or Tectum and is not available to Hornbeam within the BVI. Moreover, substantial

underlying documentation is needed to verify (or disprove) the unsupported internal accounting

records produced by Warren Steel under Korf's management, as set forth in the FTI Report.

142.    Under the circumstances, evidence that will be relevant to Hornbeam's claims in Actions

is not available in the BVI, Ukraine or Cyprus but is located in this District (in terms of both

documents and witnesses).

143.    As such, Hornbeam respectfully requests the Court grant its request for discovery

pursuant to 28 U.S.C. § 1782 to obtain discovery concerning the valuation of Warren Steel,

including its revenues, expenses, production capabilities, liabilities, and assets:

- the circumstances surrounding the loans made by the Related Party Lenders;

- the source of any funds utilized to make these loans;

- the use (or misuse) of any such funds by Warren Steel and its management;

- the precise nature and specifics of the transactions in which Warren Steel is engaged,
  including but not limited to any transactions with entities "related" to Korf and the
  Other Ultimate Beneficial Shareholders of Warren Steel;

- the current claims held by Warren Steel against third parties including but not limited
  to claims Warren Steel may hold against fraudulent transferees and Warren Steel's
  management arising from, *inter alia*, self-dealing and breach of fiduciary duty.

144.    Obtaining this information will require: (i) depositions of Warren Steel management, and

(ii) subpoenas requiring production of Warren Steel's contracts, accounts and agreements from

suppliers, vendors, financial institutions, accountants, employees and counterparties, all of which

persons and documents are located in the United States; (iii) depositions of the Related Party

Lenders' management, and (iv) subpoenas requiring production of the Related Party Lenders'

financial statements and resolutions concerning the related party loans, all of which persons and documents are believed to be located in the United States.

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:      Zurich, Switzerland
            December 23, 2014

                                 Fabrizio N. Campanile